## Isaac Norris and John Hall *against* the President and Directors of the Insurance Company of North America.

In covenant, on the plea of covenants performed, defendant must begin the evidence, and conclude to the jury.

A policy of insurance may be explained and controlled by the written order to make insurance.

To subject insurers to a loss, the risk run must correspond with the risk understood and intended to be run at the time of subscription.

Insurers are bound to inform themselves of the course and usage of trade.

COVENANT against the defendants, on a policy of insurance, subscribed by Charles Pettit, their president, under their common seal, upon all goods laden or to be laden on board the brig "American," Thomas Town, jun., master, at and from Port de Paix to Philadelphia, with liberty to touch at one other French port, on the north side of the island of Hispaniola, beginning the adventure on the said lawful goods and merchandizes from and immediately following the loading thereof on board of said vessel at Port de Paix.

This policy was subscribed on the 9th March 1797, for 12,000 dollars at a premium of 8 per cent. and if no loss happened, 2 per cent. to be returned, if the vessel proceeds direct from Port de Paix to Philadelphia.    It was expressly declared therein that the insurance was made on goods and cash.

The plaintiffs' written instructions to the office of the defendants, were "insure 12,000 dollars property on board the brig "American, Capt. Thomas Town, jun., at and from Port de Paix "to Philadelphia."    It appeared by a witness, that their chief object was to have this cash on board the brig, then understood to be at Port de Paix, insured, and that they said at the office, they had been informed this would not be the case unless the specie was particularly mentioned.

*85]    *Captain Town made two protests.    The first at Port de Paix stated, that he sailed from Philadelphia on the 31st October 1796 ; cleared out for St. Bartholomew's, but bound to Marigalante, where he arrived on the 18th November, and was refused permission to trade.    He sailed next day, and on the 20th arrived at Point Petre in Guadaloupe, now called Port Liberté, where he sold his cargo, and received on board coffee, cotton and sugar.    From thence he proceeded to St. Thomas's, and arrived there on the 5th January 1797, and sold his cargo for 18,247 dollars.    He there bought 98 barrels of flour, and on the 22d January sailed from thence for Cape Francois, but being chased off Monte Christo by an English man of war, a brig and cutter, was forced on the 26th into Port de Paix. The administration at Port de Paix, on the 27th January, put a guard of soldiers on board the brig, and seized his papers and sent them to Cape Francois.    He was obliged to go to the Cape

to plead his cause, and on the 31st his papers were there returned to him, and declared to be in good order by the commissary. On his return to Port de Paix, the captain found the guard on board the brig, and was told by the administration, that the money should be lodged in the treasury, and he should receive payment in coffee: whereupon he put the specie under his bed, and affixed four seals to the lock of his cabin door. On the 4th February, the officers of the administration forced open his cabin door, and took away the specie, consisting of 15,449 dollars, and landed it, promising to deliver him coffee in return.

Captain Town's second protest, made at Philadelphia on the 29th May 1797, enumerated the preceding particulars, and then stated, that a few days after the administration took the specie, they forcibly seized his 98 barrels of flour, also promising him coffee in payment. He then went to Cape Francois, and on the 13th February presented a memorial to Santhonax, who directed the chief of the administration at Port de Paix to make him payment in coffee at 23 sous per lb. Hereupon he solicited payment without effect until the 10th March following, and then again went to the Cape, and on the 19th March presented another memorial to Santhonax, who ordered him back to Port de Paix, with a recommendation in his favour, but it was likewise fruitless. On the 30th March he presented a third memorial to Santhonax, who directed the *ordonnateur* to make him payment in colonial produce within fifteen days at furthest, and he thereupon obtained in coffee, duties and provisions, to the amount of about 35,000 livres, and after refusing to sign a *procès verbal*, he sailed from Port de Paix on the 13th May, and arrived in Philadelphia on the 27th May. In this second protest, captain Town *was joined by Andrew Donaldson his mate, who deposed to all the facts which happened in the brig; and [*86 the mate's examination under a rule of court confirmed his protest.

It was proved to have been the general usage of the French West India islands, both before and since the American revolution, that when any foreign vessels arrived in their ports, a guard was immediately sent on board, who received the ship's papers, which were kept for inspection, and in many instances not returned to the captain, until he had delivered to the government officers the several articles which they required, which were generally paid for in colonial produce. This practice extended even to French vessels, and particularly obtained in St. Domingo in the year 1796 and 1797. At Port de Paix there was no tribunal for adjudication, but vessel's papers were usually sent from thence to Cape Francois. The above custom was generally known to all persons, who traded to the French islands in the West Indies; and a respectable merchant swore, that he would not have demanded a higher premium, on being informed, that a guard had been put on board a vessel in one of the French islands; though, where the papers were seized with a declared

intention of selecting part of the cargo for the municipality, the case would be otherwise, the payments therefor by the administration not being experienced to be always punctual and regular.

The deposition of captain John M'Ever was read in evidence, stating, that on the 28th January 1797, he saw captain Town at Cape Francois, who informed him that he had 16,000 dollars, 100 barrels of flour, and some dry goods, on board the brig American at Port de Paix, and that the administration had taken charge of his vessel and papers there by a guard, but that Santhonax at the Cape had returned his papers again. M'Ever arrived in Philadelphia on the 20th February 1797, and had informed the plaintiffs of what he knew, and all the particulars disclosed to him by captain Town.

But these particulars were not communicated to the defendants previous to the subscription of the policy.

It was said by the plaintiffs, that the defendants had received their premium of 960 dollars, after they disputed the loss ; but it turned out on examination, that a note was given for the premium, which fell due on the 9th–12th June, and it had been paid when it came to maturity.

The plea to the suit was, covenants performed ; and the plaintiffs' counsel contended the point of order, as to who should conclude ?

*Sed per cur.* The plea is affirmative, and as it rests on the defendants, there is no doubt but they shall begin and conclude. 2 Tri. per Pais 367.   Old Law Evid. 3, pl. 8. 3 Leon. 162.   Litt. Rep. 36.   Goldsb. 23.

Messrs. Ingersoll, E. Tilghman and Moylan, for the defendants, put their defence on two grounds : 1st, That the object insured never existed.   2d, Improper concealment of facts known only to the insured.

This is an insurance on the homeward bound cargo, and the outward risk must cease before the commencement of the inward.   If the plaintiffs effected no policy to be subscribed on the outward voyage, they stood their own insurers ; and the question must be considered on principle, as a contest between the underwriters on the outward and homeward bound cargo. The terms of the policy clearly shew, that the insurance was intended for the property on the return voyage : the words are "beginning the adventure on the said lawful goods and mer-"chandizes from and immediately following the loading thereof "on board of said vessel at Port de Paix," &c., and therefore the policy did not take effect till the goods were laden in that port.   Flour and dry goods, as well as silver, were on board. It could never have been intended to bring the flour or dry goods back to Philadelphia, but to have converted these articles and the specie into colonial produce, and thence have formed a return cargo.   Whereas, if the policy had attached on those spe-

cific articles, it would have ceased when they had been exchanged for coffee, sugar, &c., which could not have been designed.

In case of proceeding straight from Port de Paix to this city, 2 per cent. of the premium was to be returned ; but, as no merchant in his senses would return immediately hither with flour and dry goods from the West Indies, it follows, that these were not the particulars of the return cargo meant to be insured. The specie cannot be separated therefrom.    The liability of the defendants is not to cease as to part of the property, and continue as to the silver.    If, however, any plain circumstances could be shewn, indicating the intention of the plaintiffs to insure these specific silver, flour, and dry goods, then on board the brig, as a return cargo, we would agree that the formality of landing and re-shipping them ought not to be insisted on, and they might be considered as laden at Port de Paix.    But this suit is brought in covenant, on the general expressions in the policy, and is not founded on any special undertaking of the defendants.

The note for the premium was given without defalcation, and was taken as cash.    The defendants had thirty days after notice of a loss before they were bound to pay even an undisputed loss. *The plaintiffs' demand of a loss was not made until the 16th June 1797, and their note fell due on the 9th–12th  [*88 June.    But if even the defendants obtain a verdict, they are not bound to return the whole premium ; because, as coffee has · been laid in to the amount of 35,000 livres, the loss must be adjusted.    An insurance on goods " at and from " a place, means from beginning to load them.    Wesket 24.

As to the point of concealment, if it was of a material circumstance, which if communicated would have prevented the subscription of the policy, or have caused a higher premium to be demanded, the policy is thereby vitiated ; and it is of no moment whether the neglect arose from accident or design. Park. 195.    The case of the captain being restricted to one of three routes, from one port to another, shews to what extent this doctrine has been carried.    7 Term Rep. 162.    If the insurance of the identical 98 barrels of flour was contemplated by the plaintiffs, it ought to have been disclosed to the defendants, that they were received on board the brig at St. Thomas's, previous to the 22d January, because there was a greater risk of average loss on this article than on colonial produce.

The custom and usage of the French West Indies has been relied on.    Merely placing a guard on board a vessel upon her arrival at one of the islands, and receiving her papers, may be considered in the light of a commercial regulation, and may be analogous to a custom house officer being put on board, to prevent the landing of goods ; but the administration here taking charge of the vessel and cargo, seizing the papers and sending them to Cape Francois, (the tribunal of adjudication,) thereby obliging the captain to repair thither to plead his cause, shew at

3 YEATES—6

least the evident intention of the administration to select part of the cargo for the use of the municipality, if all ideas of confiscation had been relinquished.    Surely a representation of all these circumstances would have determined underwriters to exact a higher premium, than in the common case of taking a ship's papers for inspection !

Messrs. Rawle and Wells for the plaintiffs.    If after a call for the loss, the defendants demanded and received the premium, they thereby waive all objections to the policy, on the ground of their running no risk.    It is the risk run which entitles underwriters to their premium, and in every case, where a policy has been vacated on the ground of the risk not having occurred, except actual fraud, the premium must be returned.    It is absurd to suppose, that where a policy has been vacated, because the *object insured never existed, the insurers shall retain the premium in order to adjust a supposed loss.

*89]

But independent hereof, it is contended, that though the outward bound voyage originally commenced to Marigilante, yet the captain not being allowed liberty to trade there it terminated at Guadaloupe, where he disposed of his cargo and received the proceeds on board.    From hence the homeward voyage begins. If the outward voyage should be supposed to subsist while the brig lay at Port de Paix, and if the cargo there could not be disposed of, at what time would the present policy begin to operate ?    Or would it never come into operation ?

As to the specie, it certainly can make no difference to the underwriters at what port it was received on board, and it has been admitted, that if it could be shown that the property on board the brig at Port de Paix was meant to be insured as the return cargo, the idle ceremony of landing and re-shipping the articles should be dispensed with.    Now the plaintiffs knew that the outward bound insurance ceased on the vessél's being forced into Port de Paix.    They were informed, on the arrival of captain M'Evers, that the money, flour and dry goods, were on board the brig at the time of his interview with captain Town, at the Cape.    Under these impressions the policy was opened, and their chief object was to insure the cash, which was particularly mentioned in the policy.    Their written instructions to the office were, "insure 12,000 dollars property on board the "brig American, at and from Port de Paix," &c.    If the wording of the policy is defective, the intention of the parties may be collected herefrom, and it shall control the formal expressions. Thus in 1 Atky. 548, the terms "at and from" in a policy, were corrected by the label, or minutes of the agreement, where the policy differed from them.    The strictum jus or apex juris is not to be applied to such commercial instruments, but according to the usual course of trade, and for the benefit of the party insured.  Park. 43.    1 Burr. 348.

The words "at and from" in a policy have frequently come

before courts of justice for construction.   Thus, "at and from" L'Orient include an embargo laid there, which prevents the voyage. Per Lord Chief Justice KENYON, 6 Term Rep. 413.   At and from Bengal to England, mean the first arrival at Bengal, and where such words are used in a policy, first arrival is always implied and understood.   Per Lord Chancellor HARDWICKE, 1 Atky. 548.   When a ship is insured at and from a place, and it arrives at that place, as long as the ship is preparing for the voyage for which it is insured, the insurer is liable; but it is otherwise where all thoughts of the voyage are laid aside. Per *eundem*, 2 Atky. 359.   On an insurance from London to   [*90 Jamaica generally, the vessel touched for some days at one port in Jamaica, but was lost in coasting the island, before she had delivered all her outward bound cargo; it was held that the outward risk ended when the ship had moored in any port of the island, and did not continue till she came to the last port of delivery. 1 Bl. Rep. 417.   Outward risk on a ship ends 24 hours after its arrival in the first port of the island to which it was destined; but the outward policy on goods continues until they are landed. Park. 43, Barrass *v.* the London assurance company.

The plaintiffs here have pursued the usual mode of recovery on policies of assurance. They know of no other mode in which the defendants as a corporation could be subjected to payment on their special contract.

. As to the concealment alleged, the insured are not bound to communicate what the insurers are bound to know.   Where a fact exists of a general political nature, the latter must inform themselves of it. 3 Burr. 1905.   The course of trade must govern for the benefit of the insured. 1 Burr. 348. Where the general well known custom on a voyage to China is to take out the sails, &c. and put them on shore in a store-house, and they are thereby accidentally burnt, the insurers are liable. Ib. 341.

Every insurer is presumed to be acquainted with the trade he insures, whether recently established or not.   If it be the usage, though only for one year, he is bound to inform himself of it. Doug. 492.   Where a ship was condemned in the French admiralty, on the ground of having an English supercargo on board, the court laid down the rule, that if both parties were ignorant of the oppressive French ordinance, on which the condemnation was had, the insurer must bear the loss; and if he knew of such an edict, it was his duty to inquire whether such a supercargo was on board. Park. 220.

The witnesses have fully established the custom of putting a guard on board both of foreign and French vessels, and taking the vessel's papers, in the French West India Islands, for many years past.   The administration had declared no intention of selecting any part of the cargo for the use of the government, when M'Evers met with captain Town at Cape Francois; on the contrary, Santhonax actually delivered back the papers of the brig to captain Town on his application to him at the Cape.

[Norris et al. *v.* Insurance Co. of North America.]

Considering French manœuvres as applied to the American trade, it was no more than a prudential step in the captain to go to the commandant at the Cape in person, and look after the interest of his employers, or as he calls it in his protest, to *plead his cause there. Neither he nor the plaintiffs could possibly divine, that on his return to the port where his brig was, his specie or flour would be put in requisition by the municipality. As far as events had occurred to the captain, or mate, previous to the 1st February, the vessel was strictly within the usual custom of the island, of which the insurers were bound to take notice as the course of trade. The counsel for the plaintiffs also cited the cases of Pene *et al. v.* Vanuxem, and Same v. Pratt and Kintzing, as determined in this court last term.

*91]

SHIPPEN, C. J. delivered the charge of the court. The assertion of the plaintiffs, that the defendants demanded and received the premium of insurance, after the demand made for the loss, seems to be fully obviated by the defendants' statement.

The words of the policy are explicit and clear in favour of the defendants, if considered merely by themselves, independent of the written instructions or order to make insurance. In the first part of the policy, the voyage is described "at and from Port "de Paix to Philadelphia, with liberty to touch," &c.; but in the latter part thereof, according to the constant form, it points out what shall be called the risk, and the words there are, (1 Atky. 546) "beginning the adventure on the said lawful goods and "merchandizes, from and immediately following the loading "thereof on board of said vessel at Port de Paix." But the order runs thus: "Insure 12,000 dollars property on board the "brig American, at and from Port de Paix to Philadelphia." This memorandum shews the intention of the plaintiffs to have been, to insure the articles on board at the time of the receipt of their last intelligence, however injudicious the measure might have been. This will control and explain the expressions in the formal policy, and the mistake of the clerk therein shall be rectified thereby, according to the authority cited. 1 Atky. 547. It appears to have been the capital object of the plaintiffs, to insure the specie then laden in the brig at Port de Paix, and they are so mindful thereof, that they insist on the word cash being inserted in the policy. As to the money, it certainly was not material to the insurers where it was shipped, though it might be otherwise as to the flour and dry goods on account of average loss, as they might possibly have suffered in the previous voyage from St. Thomas's. The defendants certainly knew of cash being on board, and also of other merchandize, though they may not have been informed of the articles. The present exception appears to me a technical one, and if there was nothing else in the case, ought not to prevent the recovery of the plaintiffs.

[Respublica *v.* Cobbet.]

On the head of concealment, it becomes the duty of the jury *to ascertain the facts in the first instance. Hence arises the law. Be it with them therefore to determine, [*92 under all the circumstances of the case, whether the events which took place as to the brig at Port de Paix, were within the usage and course of trade of the French part of the island of St. Domingo. If they shall be of opinion, that every thing which happened there was consonant to and within the custom, then the want of communication of the particulars received from captain M'Ever, cannot vitiate the policy, because all the cases abundantly prove that the underwriters were bound to inform themselves of such custom. But if they shall be fully persuaded, that other circumstances occurred not warranted by, nor within the custom, they are next to inquire of the materiality of those circumstances with respect to the subject of the present controversy, and whether the communication of those occurrences would have varied the risk in the judgment of the insurers. The verdict must necessarily, as to this last point, depend on the just inferences and conclusions which the jury draw from the whole mass of the testimony. To subject the corporation to a loss, the risk really run, must correspond with the risk understood and intended to be run at the time of their president's subscription of the policy. 3 Burr. 1909.

When the jury were prepared to give their verdict, Mr. Ingersoll on the part of the defendants, excepted to the charge of the court, relative to the insurance on the homeward bound voyage; and said, he would draw up the exception at large, which might be corrected by the judge's notes, if necessary.

Mr. Rawle for the plaintiffs, thought the exception came too late, and that it should have been tendered before the jury left the bar to consider of their verdict.

*Per cur.* The bill of exceptions may be put in at any time before the jury have given in their verdict. 1 Tri. per Pais. 229. 2 Tidd 578.

The jury found a verdict for the plaintiff, the parties agreeing that the sum should be liquidated amicably.