97 P.2d 374

**POINTS v. WILLS et al.**

No. 4456.

Supreme Court of New Mexico.

Aug. 23, 1939.

Rehearing Denied Dec. 9, 1939.

Sanders & Taggart, of Lordsburg, for appellant.

Joseph L. Dailey, of Albuquerque, for appellees.

BICKLEY, Chief Justice.

Claim was filed by the dependents of W. R. Points, deceased, for compensation for his death against W. O. Wills, Jr., his employer, and Pioneer Mutual Compensation Company, insurer.

The insurance company answered denying liability to claimant on the insurance policy and set up four defenses to a claim of liability under the policy in an answer by way of new matter and cross-action against the employer, to-wit, that the death of Points occurred prior to an acceptance of the policy, that the subject matter of the policy had been partially destroyed prior to acceptance, that the policy was dated December 5th through clerical error, and because of concealment on the part of the employer of the accident and because of such clerical error, the policy should be reformed to be effective from December 8th, and because of such failure by the employer to notify the insurance company, the in-

surance company was entitled to rescind and cancel the policy.

The employer filed no answer. He was represented by counsel at the trial but presented no evidence, and is not represented here. The trial court found against claimant and entered judgment dismissing the claim both as to the employer and the insurance company.

The circumstances surrounding the issuance of the insurance policy here involved and the accident which resulted in the death of the workman are these:

On December 5, 1937, the employer, W. O. Wills, Jr., filled out an application for a policy of workmen's compensation insurance upon a form furnished by the agent of the insurance company at Lordsburg, New Mexico. In the space provided therefor the employer asked that the insurance period be from December 5, 1937, to December 5, 1938. This application was mailed with a check for $150, the required deposit, to the agent of the insurance company whose office is at Lordsburg, and was received by the agent on the morning of December 6th. On December 7th, the agent endorsed the check and sent it with the application to the office of the insurance company in Santa Fe, where it was received on the morning of December 8th. On the 8th, the company accepted and approved the application and issued a policy of workmen's compensation insurance to be effective for one year from 12:01 A. M., December 5, 1937. The policy was delivered by the agent to the employer at Lordsburg on or about December 11th, and on December 13th, the policy was approved by George W. Hay, District Judge, and was filed in the office of the County Clerk of Hidalgo County on the same day.

The accident, which resulted in the almost immediate death of W. R. Points, the employee, occurred shortly after noon on December 6th. The employer was advised by telephone of the accident the same afternoon. The employer did not notify the insurance company or its agent of the accident until December 20th, which was after the issuance and delivery of the policy.

Appellant (claimant below) assigns as error the admission of certain testimony of Maybelle Harrington, who had previously testified that she was employed by the Pioneer Mutual Compensation Company in the capacity of office manager of the Compensation Underwriters and that her duties as office manager consisted of "accepting, separating the applications, making up the policies, taking care of the payrolls." The testimony objected to is as follows:

"Q. And the policy date which you filled in the policy was December 5, 1937, 12:01 A. M., expiring December 5, 1938. Will you state what the policy of the company is with respect to the effective dates of the policy?

"Mr. Hodges: We object to that as being immaterial as to what the policy of the company is. The policy speaks for itself and this witness should not be allowed to dig up some private rule that is unknown

to the people dealing with them. It is manifestly unfair.

"Mr. Dailey: It is material on the question of mistake conforming with the constructive fraud defense we have set up. It is also material under the first defense we have set up that no contract was made because there was no meeting of the minds of these parties by reason of the facts that the date of December 5th instead of December 8th was inserted in the policy through clerical error. What I want to establish is the policy of the company, the authority of Miss Harrington as its general agent who filled in the date to show that she neither had the authority to insert that date and that she did it through a mistake, clerical error.

"Mr. Hodges: To which I reply that the company is bound by the acts of its own agents. They acknowledged the check for the principal and issued the policy under that date and there can't be any question to it.

"The Court: Overruled.

"Mr. Sanders: May it please the court I want to make the same objection on behalf of the claimants.
* * *

"Mr. Hodges: To which ruling we except.

"Mr. Sanders: Yes, sir.

"A. It is the policy of the company to date the policies as of the date they are received in the office and each date is stamped on the application when we get it, and when I made up this policy I was following the application and I made an error which is not the policy or rule of the company at all, it was my own error.

"Mr. Sanders: May I enter an objection to any mistake on the part of the company?

"The Court: You may make that objection.

"Mr. Hodges: And I join on the part of the employer.

"The Court: Overruled."

In a note in Ann.Cas.1914C, page 72, on admissibility of parol evidence to show custom or usage pertaining to matters contained in an insurance policy, the note writer says:

"Parol evidence is admissible as to a uniform, continuous and well settled usage or custom pertaining to the matters embraced in the contract, unless such usage or custom contravenes a rule of law, or *alters or contradicts the express or implied terms of an unambiguous contract.* (Citing cases.) * * * (Emphasis ours.)

"Where, however, a written contract is susceptible on its face of a plain and unequivocal interpretation, resort cannot be had to evidence of custom or usage to explain its language or qualify its meaning. (Citing cases.)

"In Lattomus v. Farmers' Mut. Fire Ins. Co., 3 Houst. (Del.) 254, the holding of the court seems to be to the effect that the insurer could not show a by-law whereby it was liable to contribute and pay on a fire

insurance policy only in proportion to what was paid on the same property insured in a third company, or a custom to the effect that such payment and contribution was a satisfaction in full and a discharge of the policy. The decision seems to rest on the ground that the custom sought to be introduced in evidence was a particular custom and that none but a general custom having the effect and operation of a general rule or law could be shown. * * * In Northwestern Fire & Marine Ins. Co. v. Connecticut Fire Ins. Co., 105 Minn. 483, 117 N.W. 825, it was held proper to exclude proof by the insurer of a usage among insurance companies that the effect of a binder was to obligate the insurer from the issuance and date thereof, *because it directly contradicted the time stated in the policy.*" (Emphasis ours.)

In Orient Mutual Ins. Co. v. Wright, 1 Wall. 456, 470, 17 L.Ed. 505, the court, in excluding evidence of usage, said: "When we have satisfied ourselves that the policy is susceptible of a reasonable construction on its face, without the necessity of resorting to extrinsic aid, we have at the same time established that usage or custom cannot be resorted to for that purpose. * * * In the case of The Reeside, 2 Sumn., 567, Mr. Justice Story, after using language strongly condemning the tendency to introduce and rely on usages in courts of justice, and defining their true office * * * proceeds to say: 'But I apprehend that it can never be proper to resort to any usage or custom to control or vary the positive stipulations in a written contract, and a fortiori, not in order to contradict them. An express contract of the parties is always admissible to supersede or vary or control a usage or custom; for the latter may always be waived at the will of the parties. But a written and express contract cannot be controlled or varied or contradicted by a usage or custom, for that would not only be to admit parol evidence to control, vary or contradict written contracts, but it would be to allow mere presumptions and implications, properly arising in the absence of any positive expressions of intention to control, vary or contradict the most formal and deliberate written declarations of the parties.' " See also 14 R.C.L., title "Insurance", § 111; 27 R.C. L., "Usages & Customs", § 28; Transatlantic Shipping Co. v. St. Paul Fire & Marine Ins. Co., 2 Cir., 9 F.2d 720, 46 A.L.R. 946, which contains a collection of the leading cases on this point; Restatement of the Law of Contracts, §§ 245, 247.

It was not shown that the "policy or rule" referred to by the witness was a custom or usage of insurance companies generally or that the custom was known to the insured. See Restatement of the Law of Contracts, § 247. The policy on its face is plain and unequivocal as to the effective date.

Let us eliminate for the moment the questions of the policy or rule of the company as to dating its insurance policies and the admissibility of the evidence as to mistake, and consider whether the purported mistake in inserting the effective

date of the policy is ground for reformation.

█ The law in respect to jurisdiction of courts of equity to grant relief where a mutual mistake in the writing of a contract results in the written terms of the contract not expressing the clear intent and understanding of the parties is well settled by the courts. Dearborn v. Niagara Fire Ins. Co. of City of New York, 17 N.M. 223, 125 P. 606. And in Restatement of the Law of Contracts, § 504, we find the following: "* * * Where both parties have an identical intention as to the terms to be embodied in a proposed written conveyance, assignment, contract or discharge, and a writing executed by them is materially at variance with that intention, either party can get a decree that the writing shall be reformed so that it shall express the intention of the parties, if innocent third persons will not be unfairly affected thereby." In § 503 of the same text is this statement: "A mistake of only one party that forms the basis on which he enters into a transaction does not of itself render the contract voidable. * *"

Appellee cites some authority to the effect that a clerical error is ground for reformation of an insurance policy, and that where the mistake is due to clerical error it is not necessary to show mutuality of the mistake. Gouch Cyc. of Insurance Law, § 1391. This text refers to the case of Born v. Schrenkeisen, 110 N.Y. 55, 17 N.E. 339, where it is said: "Where there is no mistake as to the terms of an agree-ment, but through a mistake of the scrivener, or by any other inadvertence in reducing it to writing, the instrument does not express the agreement actually made, it may be reformed by the court; *it is only where an action is to reform the agreement itself* that it is necessary to allege in the pleadings and prove on the trial that the mistake was mutual." (Emphasis ours.) This case is followed in MacDonald v. Crissey, 215 N.Y. 609, 109 N.E. 609. See also Haley v. Sharon Tp. Mut. Fire Ins. Co., 147 Minn. 190, 179 N.W. 895; Mutual Life Ins. Co. of Baltimore v. Metzger, 1934, 167 Md. 27, 172 A. 610.

In 11 C.J. 839, "Clerical Error", it is said:

"A clerical error exists when without evident intention one word is written for another, when the statement of some detail is omitted the lack of which is not a cause of nullity, or when there are mistakes in proper names or amounts made in copying but which do not change the general sense of a record; a mistake in copying; a mistake in copying or writing; a mistake of a clerk in writing; a mistake in copying or transcribing a written instrument; a mistake which naturally excludes any idea that its insertion was made in the exercise of any judgment or discretion, or in pursuance of any determination; * * * an error which appears to be such on the face of an instrument, and the nature of which is ascertainable from the instrument itself; an error made by a clerk in transcribing, or otherwise, which must be apparent on the

face of the record, and capable of being corrected by reference to the record only."

" * * * The expression [clerical error] assumes that the mistake or negligence or carelessness is that of one engaged in the subordinate service of transcription, copying, or comparison; a labor not requiring original thought." Morimura v. United States, C.C., 160 F. 280, 281.

Miss Harrington's duties consisted of "accepting, * * * making up the policies, etc." And she testified that in making up the policy she followed the application and inserted the date December 5th, and that it was her own error. She did not copy from another paper which said the policy should be effective from December 8th, and inadvertently insert the wrong date. She had authority to accept and write policies, and in inserting the date of December 5th in the policy she wrote up, she accepted the application in the terms in which it was written. It may be true, if we regard the testimony of the witness as to the policy of the company, that she made an error, but it was not a mechanical error. She wrote what she intended to write. If error was made, it was in forming an incorrect intention. It was not a lapsus calami; it was more like a lapsus memoriae.

We must view the matter, therefore, as governed by the principles applying to reformation of contracts for mutual mistake. See Couch, Cyc. of Insurance Law, § 1391, note 7; National Union Fire Ins. Co. v. Patrick, Tex.Civ.App., 198 S.W. 1050; Hay v. Billeter, 83 Ind.App. 244, 148 N.E.

159; Cline v. Iowa State Live Stock Ins. Co., 195 Iowa 918, 192 N.W. 309.

In St. Paul F. & M. Ins. Co. v. Shaver, 76 Iowa 282, 41 N.W. 19, 20, the court said: "Defendants, then, were not parties to the mistake; for the policy afforded them the protection which they sought, and they had no knowledge, until after the loss, that Giberson, in his communication with Anderson & Son, had departed from their instructions. It was proven, however, that defendants were informed, before the policy was issued, that none of the insurance companies doing business in Cedar Rapids would accept a single risk upon property situated in different buildings, unless the policy contained what is known as the 'average clause,' * * * and it is probably true that they understood that that provision would be inserted in the policy, but it was not. If plaintiff had acted promptly with reference to the matter, after it discovered this omission, it may be that it would now be entitled to a reformation of the policy in that respect. But it did not. * * * Upon this state of facts, it is very clear, we think, that plaintiff is not now entitled to relief [reformation]. The mistake was its own, and it permitted defendants to remain in ignorance that one had been committed until the loss occurred. * * *"

█. Without showing that the employer had knowledge that it was the policy or rule of the company to date contracts of insurance as of the date applications were received, appellee could not show that the

employer knew that the policy would be written to be effective as of the 8th, or that there was an agreement, express or implied, between the insurer and the employer that the effective date would be other than December 5th. To the contrary, the application was for a policy of workmen's compensation insurance to be effective from "Dec. 5, 1937 to Dec. '5, 1938." And the application is usually given great weight in determining the intention of the parties in a suit for reformation. Peterson v. Commonwealth Casualty Co., 212 Mo. App. 434, 249 S.W. 148; St. Paul F. & M. Ins. Co. v. Shaver, supra; Norris v. President of Insurance Co. of North America, Pa., 3 Yeates 84, 2 Am.Dec. 360. Where is the showing that the minds of the parties did not meet as to the date the contract was to be effective and that the contract as written did not embody the terms agreed upon by the parties?

If Points had been killed on December 6, 1938, instead of a year earlier, is it unreasonable to surmise that the insurance company would have been content to abide by the terms of the policy as written, with its expressed expiration date as of Dec. 5, 1938? How could the dependents have proved that there had been a mistake and that the policy did not expire until December 8th? In the case of Cline v. Iowa State Live Stock Ins. Co., supra, an insured was attempting to reform a policy of insurance in order to extend the expiration date to cover a loss which occurred *after* the date shown in the policy on the ground that the policy was dated back through "error or oversight" and should have been dated as of the date it was written and accepted instead of dating from the expiration of an old policy. The court there said [195 Iowa 918, 192 N.W. 310]: " * * * The insured was clearly entitled to insurance for 12 months; but, unless he has made out a case for the reformation of the policy, we must treat the term as commencing October 17, 1919, and no recovery can be had in this action. To entitle him to reformation, the evidence of mistake or oversight must be *clear, convincing, and satisfactory*. The question is different from what it would be if the animal had died after the application was signed and delivered with the oral agreement that the insurance should commence at once, and before the policy was delivered. If that was the situation, a jury might readily find upon the record before us that appellant [insurance company] waived the provision in its policy quoted above and return a verdict for the plaintiff. Appellant, *of course,* concedes in this case that the provision was waived and that the insurance became effective upon the expiration of the prior policy. * * *" (Emphasis ours.)

Appellant argues that the statements of the witness quoted supra should be disregarded because of the self-serving character thereof. Appellant did not object to the testimony on that specific ground, and we assume that self-serving testimony, if believed by the trial judge, might under

ordinary circumstances be sufficient to sustain the finding as to mistake; but since we find the testimony of the witness relative to the "policy or rule" of the company as to the effective date of the risk must be disregarded because inadmissible, we are constrained to the belief that the trial judge would have given less consideration to such testimony because of its self-serving nature, when shorn of the support given it by the testimony regarding the so-called custom, in determining whether the evidence of mistake was "clear, convincing and satisfactory."

We must conclude, therefore, that the finding and conclusion of the trial court that the dating of the policy of insurance by the insurance company as of December 5, 1937, was an error made in the office of the company, that the policy should have been dated December 8, 1937, and that the same was effective as a policy of workmen's compensation insurance on December 8, 1937, and should be reformed to so read, was erroneous.

With the elimination of the question of mistake in inserting the date, we have before us a policy of workmen's compensation insurance which upon its face became valid and binding on December 5, 1937, and under which the insurance company is clearly liable to the appellant in this case. But the insurance company says that the employer was guilty of fraud in procuring the insurance, and therefore it is entitled to reform the policy so that it will defeat the claim of appellant.

The company agreed with the employer:

"One (a) To pay promptly to any person entitled thereto under the Workmen's Compensation Law and in the manner therein provided, the entire amount of any sum due, and all installments thereof as they become due. * *

"One (b) To indemnify this Employer against loss by reason of the liability imposed upon him by law for damages on account of such injuries to such of said employees as are legally employed, * * * to serve this employer (a) by inspection of work places, etc. * * * (b) upon notice of such injuries, by investigation thereof and by settlement of any resulting claims in accordance with law. To defend, in the name and on behalf of this Employer, any suits or other proceedings which may at any time be instituted against him on account of such injuries, etc."
upon certain conditions, including the following:

"B. This Policy may be cancelled at any time by either of the parties upon written notice to the other party stating when, not less than ten days thereafter, cancellation shall be effective. * * *

"D. The obligations of Paragraph One (a) foregoing are hereby declared to be the direct obligations and promises of the Company to any injured employee covered hereby, or, in the event of his death, to his dependents; and to each such employee or such dependent the Company is hereby made directly and primarily liable under

said obligations and promises. This contract is made for the benefit of such employees or such dependents and is enforceable against the Company, by any such employee or such dependent in his name or on his behalf, at any time and in any manner permitted by law, whether claims or proceedings are brought against the Company alone or jointly with this Employer. * * * *The obligations and promises of the Company as set forth in this paragraph shall not be affected by the failure of this Employer to do or refrain from doing any act required by the Policy; nor by any default of this Employer after the accident in the payment of premiums or in the giving of any notice required by the policy or otherwise; * * *"*

"E. As between the employee and the Company, notice to or knowledge of this Employer of any injury or death covered hereby shall be notice or knowledge as the case may be of the Company; * * *"

. This court in Lopez v. Townsend, 42 N. M. 601, 82 P.2d 921, 932, had under consideration a policy of public liability insurance which was claimed by the insurance company to be invalid because liability under the policy was conditioned upon operation by the bus company under a certificate of convenience and necessity and it was not shown that operations were being carried on under such certificate. Attached to the policy there involved was a statutory rider containing this provision: "The policy to, which this endorsement is attached is written in pursuance of *an* is to be con-

strued in accordance with the following law of the State of New Mexico, to-wit, House Bill No. 249, Chapter 129, Laws of 1929, and the rules and regulations of the Corporation Commission adopted thereunder, and is subject to all the provisions thereof. In consideration of the premium of the policy to which this endorsement is attached, the insurer hereby agrees to pay any final judgment within the limits set forth in the schedule below set out for injury to and/or death of persons * * * and damage to property * * * resulting from the ownership, maintenance or use of any and all motor vehicles pursuant to a certificate of public convenience and necessity issued by the Corporation Commission of New Mexico. *It is further understood and agreed by and between the Insurer and the Assured that the right of any person to recover hereunder shall not be affected by any act or omission of the Assured or any employee, of the Assured with regard to any condition or requirement of said policy, but all terms and conditions of the policy shall remain in full force and be binding as between the Insurer and the Assured; and the Insurer shall be reimbursed by the Assured for any and all loss, costs or expenses paid or incurred by the Assured which the insurer would not be obligated to pay under the provisions of the policy independent of, this endorsement."*

As to this clause we said:

"Undoubtedly this italicized clause has been borrowed from the language of the

standard or union mortgage clause employed with respect to a mortgagee's rights under fire insurance policies. It is very similar in form. * * *

"The position of the public for whose benefit the policy is issued is akin to that of the mortgagee under the standard or union mortgage clause found in fire insurance policies. * * *

"The insurer will be taken to have appropriated the language quoted supra with a knowledge of the construction given it by the courts in fire policies. * * *

"Strong reasons support, whether or not such is the effect of the statute without it, the inclusion of such a provision. These policies are required by law for protection of the public. The motor carrier operating over a given route knows, or its officers should know, whether it has its certificate of convenience and necessity. The travelling public neither knows, nor has ready means of ascertaining, whether such be the case. A passenger about to purchase a bus ticket and employ the carrier's services will not pause to inquire, nor does this policy provision contemplate that he shall do so, whether such carrier has its certificate of convenience and necessity or has fulfilled other conditions or requirements of the policy essential to its validity as between the carrier and the insurer."

■ The same situation exists in connection with workmen's compensation insurance. Sec. 2, Ch. 92, L. 1937 (§ 156-104, N.M.S.A. 1938 Supp.) provides that an employer is *conclusively* presumed to have accepted the provisions of the Act unless prior to the date he becomes such employer he shall have filed with the County Clerk a notice in writing that he elects not to accept the provisions of the Act. An employee, then, when he enters such employment can assume that unless such notice is filed with the County Clerk his employer has accepted the terms of the Act, with the consequent duty of providing insurance or satisfying the district judge that such security is unnecessary, as prescribed by the statute. If, as the insurance company contends, it can deny liability to the employee because of a failure or fraud upon the part of the employer, the effect would be to place upon the employee the duty of inquiring about the status of the insurance carried by his employer, finding out when premium payments were due and seeing that they were paid, checking the payroll statement for errors and misstatements— in other words, seeing that his employer complies with every condition of the policy.

Many courts have recognized that the employee stands on a different footing as regards recovery under a workmen's compensation insurance policy than does the employer.

In Southern Casualty Co. v. Freeman, Tex.Com.App., 24 S.W.2d 370, 372, the court said: "The insurance was then in effect for the benefit of Fowler and his employees who became interested in and parties to the contract, and Freeman's [the employee's] rights to compensation there-

under which had already accrued could not be abrogated to his detriment."

In Aioss v. Sardo, 223 App.Div. 201, 227 N.Y.S. 708, 710, affirmed 249 N.Y. 270, 164 N.E. 48, the court said:

"Whatever the rights may be between the carrier and the insured employer, so long as the policy, once it is issued, is outstanding, the carrier's liability to the injured employee remains. No question of warranties or of false representations made by the employer in securing the policy and no stipulations of the policy as between the employer and carrier have force or effect as between the carrier and such an employee who was injured while the policy is outstanding.

"A chief purpose of this law is to assure payment of any and every award to an injured employee; this is accomplished by requiring that every employer, except a self-insurer, shall insure and keep insured. Our construction effectuates this purpose."

In the per curiam opinion affirming this decision, Aioss v. Sardo, 249 N.Y. 270, 164 N.E. 48, it is said: "There is here a distinct and independent contract with the employee. Workmen's Compensation Law (Consol.Laws, c. 67) §§ 10, 25, 50, 54. So the policy itself provides. It adds: 'The obligations and promises of the company as set forth in this paragraph shall not be affected by the failure of the employer to do or refrain from doing any act required by the policy,'—and further that the company shall be bound by any award rendered against the employer. Under these circumstances, *as between the insurance carrier and the employee* the fact that a policy is issued upon untrue statements made by the employer is no defense. Hastings v. Westchester Fire Ins. Co., 73 N.Y. 141. To relieve the carrier of liability, there must be a cancellation as provided in section 54." (Emphasis ours.) (The case of Hastings v. Westchester Fire Ins. Co., supra, cited as authority in the above quotation, is a case dealing with a fire insurance policy containing a mortgagee clause.)

In United States Fidelity & Guaranty Co. v. Taylor, 132 Md. 511, 104 A. 171, 173; 18 Neg. & Comp. Cases Anno. 566, the insurance company sued the employer to recover compensation payments which it paid to the dependents of a deceased employee under an award made by the Industrial Accident Commission, the insurance company claiming that as between it and the employer the policy was void because of false representations. The court said:

"This case is a very peculiar one, and we have not been referred to any decision that is very apposite. So far as the liability of the appellant to the widow for the compensation is concerned, there can no longer be any question. That was determined by the commission and affirmed by the superior court of Baltimore City, no appeal having been taken to this court. In its opinion the commission referred to the contention of the insurance company that the 'coverage provisions' were limited by

the 'declarations' of the employer contained in his application for insurance, which declared that he employed no other employes except chauffeurs and helpers, and that therefore only such employes were covered by the policy, and said:

" 'If the rights of third parties were not involved, we might accept this view as correct; but, however the terms of the application and the declarations of the employer may affect the question as between the insurer and the employer, they cannot affect the right of the injured employe, or his dependents, in case of death, to the security of payments of compensation stipulated in paragraph 1 of the policy, and this is so because of Condition M, of the policy.'

"After quoting Condition M [which is substantially the same as Condition D in the policy here under consideration, quoted supra], the opinion went on to say that:

" 'The proviso clause in this condition of the policy was inserted by the commission for the express purpose of defeating any such contention as that now made by the insurance company, and we are of the opinion that it does have that effect, and that, notwithstanding the "declarations" of the employer, the policy is effective in securing the payment of compensation to which the employe, or his dependents, may be entitled, *regardless of the statements or declarations made by the employer in his application for insurance.'*

" * * * There are two distinct obligations upon the insurance company; one to secure payment of the compensation to the employe, and the other to indemnify the employer against loss for the liability imposed upon him by law for damages on account of such injuries or death. By reason of the provisions of Condition M, the company cannot rely on the statements of the employer in the items in the declaration, so far as they affect the right of an employe or his dependents, to recover compensation; but that ought not and does not prevent it from requiring the employer to live up to his declarations and the terms of the policy, in so far as the rights between them are concerned. * * * *"

■ This court is committed to the doctrine that a liberal construction in favor of a claimant under the terms of the Workmen's Compensation Act should be favored, as the theory of the legislation is compensation, not the lack of it. Gonzales v. Chino Copper Co., 29 N.M. 228, 222 P. 903. And in Christensen v. Dysart, 42 N.M. 107, 76 P.2d 1, 3, we said: "While the effects on the public and the employer were given consideration, the main purpose of this legislation was to afford compensation for injuries and protection to employees engaged in hazardous occupations and to provide benefits to their dependents in case of death. It is not in keeping with the public policy of the state to countenance overreaching on the part of an employer in making contracts with his employees which deprive them of part of the compensation to which they would be entitled under the terms of the Workmen's Compensation Act."

Much less should we countenance an attempt by an insurance carrier to avoid liability to an employee or his dependents in contravention of the plain and express terms of the insurance contract itself, because the employer failed in his duty to the insurance company in respect to securing the insurance or keeping it in effect. If the insurance company is aggrieved by the conduct of the employer, then it is he who should respond to the company, not the innocent employee.

The trial court in his judgment dismissed the claim both as to the employer, W. O. Wills, Jr., and the Pioneer Mutual Compensation Company, insurer. The evidence does not show that the employer had given any notice in compliance with the terms of the Workmen's Compensation Act that he elected not to come under the Act; it follows that he was bound by the conclusive presumption provided in § 156-104, N.M.S.A. 1938 Supp. In addition, a provision in the "New Mexico Standard Workmen's Compensation Endorsement" attached to the insurance policy is as follows: "This employer, upon the acceptance of this Policy, agrees that at the effective date hereof he is bound by the above cited Workmen's Compensation Law in full compliance with Section 2 thereof, and will not give any notice or make any declaration to the contrary, as provided in Section 9 thereof, during the Policy Period." The employer was clearly liable.

We therefore hold that claimants should have had judgment for compensation and funeral expenses in the amount allowed by Section 9, Ch. 92, L. 1937 (§ 156-117, N.M.S.A. 1938 Supp.) against the Pioneer Mutual Compensation Company, insurer, and W. O. Wills, Jr., employer, jointly and severally.

Counsel for appellant assign as error the court's refusal to award a reasonable attorney's fee for the prosecution of the suit on behalf of claimant in the lower court, and ask that this court allow an attorney's fee for the prosecution of the appeal. In view of the determination of this cause, counsel for claimant and appellant are entitled to a reasonable and proper attorney's fee for the prosecution of this case in the trial court and in the Supreme Court (§ 156-122, N.M.S.A. 1938 Supp.) in addition to the compensation awarded the claimant. A reasonable fee for such representation in this court is $400.

The judgment is reversed, and the cause remanded to the district court, with instructions to enter judgment in accordance with the views herein expressed, and to allow counsel for appellant a reasonable fee for prosecution of the cause in the district court in addition to the amount of $400, for services in this court; and it is so ordered.

BRICE, ZINN, SADLER, and MABRY, JJ., concur.

On Motion for Rehearing.

BICKLEY, Chief Justice.

The appellee has filed a motion for rehearing, the principal reliance of which is

the assertion that this court failed to pass "upon a material and controlling point raised in the briefs, and argued before this court and upon which issue was joined by appellee and appellant, namely: That there had been no contract of insurance entered into by and between the appellee and W. O. Wills, the employer-applicant, at the time of the injury and death of the employee, W. R. Points, deceased, and that the concealment by the employer-applicant of the fact of the death of the employee, W. R. Points, prior to an acceptance of the application was such fraud as prevented the policy attaching." Appellee is mistaken. After the consideration of alleged mistake in inserting on December 8th the date December 5th as the effective date of the policy, we said: "But the insurance company says that the employer was guilty of fraud in procuring the insurance, and is therefore entitled to reform the policy so that it will defeat the claim of appellant." This necessarily involved a consideration of whether the policy had attached and was still in effect as to appellant.

We considered it sufficient answer to point to Lopez v. Townsend, 42 N.M. 601, 82 P.2d 921, and to draw an analogy thereto. In support of the analogy we cited decisions which are quite persuasive.

Appellee says that it believes that the rule announced herein as further reflected by our decision in Lopez v. Townsend, supra, "is correct insofar as it applies to policies of insurance already in effect—that is the employee or his dependents should be allowed to recover even though the employer has done some act contrary to the provisions of the policy *when and after a contract of insurance has been entered into.*" Appellee may well concede this much because the principle as to the mortgagee's immunity against defenses raised by the misconduct of the insured mortgagor is recognized universally where such misconduct takes place subsequently to the issuance of insurance policies. It is when the alleged act or neglect of the mortgagor is a representation, breach of warranty or fraudulent concealment which has occurred prior to or at the time of the issuance of the policy that there occurs a divergence of judicial opinion. The weight of authority, however, in the United States protects the mortgagee even in this case, notwithstanding its invalidity in the mortgagor's hands. For an extended discussion of the decisions on this question, see 17 Cornell Law Quarterly, 151, 158, on "Rights of Mortgagee Under Standard Mortgage Clause in Insurance Policies". See also National Fire Ins. Co. v. Dallas Joint Stock Land Bank, 174 Okl. 596, 50 P.2d 326, and notes in 18 L.R. A.,N.S., 197, 206, and in 97 A.L.R. 1165, for an appraisal of the authorities on the question; see also 58 Am.St.Rep. 671, where it is said: "Until within the last twenty-five years the customary method of indemnifying a mortgagee against loss by fire was to endorse upon the policy words making the loss, if any, payable to the mortgagee, as his interest might appear, or words of similar import. Today such an endorsement is rare. The reason for the change is found

in the fact that the old indorsement made the mortgagee a simple appointee of the mortgagor, and put his indemnity at the risk of every act or neglect of the mortgagor that would avoid the original policy in his hands. Indemnity so 'precarious, so liable to be destroyed by the ignorance, carelessness, or fraud of the mortgagors, was not satisfactory to the mortgagees,' and they proceeded to make such contracts with the insurance companies, for the purpose of securing indemnity to their interests, as would not be affected by any act or negligence of the mortgagors: Syndicate Ins. Co. v. Bohn, 8 Cir., 65 F. 165, 173, 27 L.R. A. 614, per Sanborn, Circuit Judge. So, where the loss is made payable to the mortgagee, the policy, or 'mortgage clause,' appended thereto, and made part thereof, now usually contains a condition that the insurance shall not be invalidated by any act or neglect of the mortgagor or owner of the insured property. In such cases, the 'mortgage clause' operates as a *separate and independent insurance of the mortgagee's interest*. It gives him the same benefit as if he had taken out a separate policy, free from the conditions imposed upon the owner, and *making him answerable only for his own acts*. It follows, therefore, that if a policy of insurance makes the loss, if any, payable to a mortgagee, but also expressly provides that no violation of its conditions by the mortgagor shall affect the mortgagee, the latter may recover to the extent of his own interest, notwithstanding any such violation, whether it occurred before or after the issuance of the policy." (Citing cases.)

Massachusetts by statute apparently adopted the majority view as a rule of practice and decision in compulsory motor vehicle liability policy cases by enacting: "No statement made by the insured or on his behalf, either in securing the policy or in securing registration of the motor vehicle or trailer covered thereby, no violation of the terms of the policy and no act or default of the insured, either prior or subsequent to the issue of the policy, shall operate to defeat or avoid the policy so as to bar recovery within the limit provided in the policy by a judgment creditor proceeding under the provisions of * * *". See Royal Indemnity Co. v. Granite Trucking Co., Mass., 4 N.E.2d 809, 811. Under the foregoing and other statutory provisions, the court there held:

"Insurer which dated back compulsory liability policy in ignorance that insured had been involved in an accident prior to issuance of policy, but subsequent to effective date of policy as dated back, held estopped to deny liability as to parties injured, when insurer issued certificate which was field with registrar of motor vehicles (G.L. (Ter.Ed.) c. 90, §§ 34A to 34C).

"Liability on compulsory motor vehicle liability policy which was dated back by insurer in ignorance that insured had been involved in accident prior to issuing policy, but within effective date of policy as dated back for loss suffered in such accident, held

absolute as soon as policy became effective. * * *

"Insurer on compulsory motor vehicle liability policy which had been dated back by insurer in ignorance that insured had been involved in accident prior to issuing policy but within effective time of policy as dated back, and insurer thereafter having issued certificate of insurance, held not entitled to reform policy so as to make effective date subsequent to accident and defeat recovery by persons involved in accident with insured."

Since we think that the statutory provision above quoted is merely declaratory of correct legal principles which we have already approved in Lopez v. Townsend, supra, we think the decision is valuable and illustrative in support of our conclusion in the case at bar.

It is to be noted that in Lopez v. Townsend, supra, we relied on Hastings v. Westchester F. Ins. Co., 73 N.Y. 141, the leading case for the majority view, and also upon Reed v. Firemen's Ins. Co., 81 N.J.L. 523, 80 A. 462, 35 L.R.A.,N.S., 343, and also that these two decisions are cited as authority in Goldstein v. National Liberty Ins. Co., 1931, 256 N.Y. 26, 175 N.E. 359, which settles the question as to where the State of New York stands in regard to the rights of a mortgagee under the so-called "standard" mortgagee clause. The Hastings decision is also relied upon by the New York Court of Appeals in the case of Aioss v. Sardo, 249 N.Y. 270, 164 N.E. 48, which we cited in our original opinion herein.

So it would appear that we have in the Lopez case adopted the majority view, and we adhere thereto in the case at bar. In the Lopez case we said, 42 N.M. at page 616, 82 P.2d at page 930: "The statutory rider, certainly as against the named assured, limits the insurer's liability to losses incurred through operations pursuant to such a certificate." We also adopted the view that the clause in the policy which we said was akin to the "standard" or "union" mortgage clause in fire insurance policies recognized the public as a distinct party in interest and created a new contract which was not dependent upon the original contract between the insurer and the named assured for its vitality. And it also appears that whatever may have been the vitiating effect of the absence of the certificate of convenience and necessity, it would have been the same so far as it bore upon the relations existing between the insurer and the named assured whether such absence existed before, contemporaneous with or subsequent to the issuance of the policy.

This seems a good place to refer to the argument of convenience made by counsel for appellee that under our decision the compensation insurance companies must of necessity increase their staffs of investigators and assume additional burdens in investigating each and every application before it is accepted and a policy issued to the employer, and that hereafter the insurance company must determine whether or not an injury or death has occurred subsequent to the mailing of the application and prior to

the receipt of the application in the home office of the company and that this additional burden will result in an increased rate on compensation insurance in order to meet the increased expense of such investigations. When we contemplate that the majority rule has not disturbed the situation as between the applicant for insurance and the insurance company and that the insurance carrier, having paid an otherwise invalid award, has a cause of action against the insured employer, and that the situation here dealt with is limited to a class of cases where the insurer is issuing a policy and antedating its effective date and that such companies maintain agencies frequently quite near the places where the workmen are engaged in the hazardous employments and that their policies provide for free inspection of the workings and the books, records and payrolls of the employer, and in view of the fact that a workman and his dependents entitled to the benefits of the Workmen's Compensation Law are favored in the law, we do not apprehend that our decision places too heavy a burden upon the insurance companies. Indeed, insofar as that part of the contract which is for the protection of the workman and his dependents is concerned, considering the effects of the clause in question, we think that is where the burden belongs.

The situation in the case at bar does not resemble the taking of marine insurance upon a ship known to be lost or fire insurance upon a building known to have been burned and entirely destroyed. The appellee in its answer by way of new matter alleges:

"That the alleged injury and death set out in the claim herein occurred before the application heretofore mentioned was received by the Pioneer Mutual Compensation Company and before any policy of insurance was issued to said W. O. Wills, Jr.;

"That because of such alleged injury and death, the subject matter of the said contract had, prior to the acceptance of the application of W. O. Wills, Jr., by the Company, ceased to exist or at least was materially affected."

This contention of appellee requires some examination. If the deceased Points had been an applicant for accident or life insurance, he would doubtless be the subject matter of the insurance contract applied for. If the applicant died during negotiations and prior to the acceptance of the application, it might be properly said that the subject matter had ceased to exist. If, on the other hand, the physical condition and state of health of the applicant had changed pending negotiations and before the acceptance of the application, such changes might be said to materially affect the risk, and nothing more. If Points, being injured on December 6th, had lingered and died on December 10th, two days after the application was accepted, the insurer could and doubtless would have made the same contention it now makes.

It is difficult to define just what is the subject matter of the contract of insurance under consideration. Under such policies of insurance as were involved in Lopez v. Townsend, supra, and in the case at bar, the traveling public in the one case, and workmen and their dependents entitled to the benefits of the Workmen's Compensation Law in the other, enjoy relations akin to third party beneficiaries, yet the covenants of the insurer are diverse, and we are unable to say that the traveling public in the one case and the workmen and their dependents in the other are solely the subject matter of the policies. Appellee has not been able by citation of authority or by satisfactory argument to establish that such is the case.

In Citizens State Bank v. State Mut. Rodded Fire Ins. Co., 276 Mich. 62, 267 N.W. 785, 787, which involved a fire insurance policy with the standard or union mortgage clause attached, the court said: "The effect of this clause has been the subject of much litigation, and the conclusion derived is well stated in 5 Couch, Insurance Law, § 1215 B: 'The so-called "standard" or "union" mortgage clause, making the mortgagee payee, and stipulating that the insurance shall not be invalidated by the mortgagor's acts or neglect, constitutes an independent contract between said mortgagee and insurer, and in such case the subject-matter of the insurance is the mortgagee's insurable interest, and not the real estate, and the risk will not be avoided by any acts, representations, or omissions of the mortgagor or owner, whether done or permitted prior or subsequently to, or at the time of, the issuance of the policy.' Since the case of Hastings v. Westchester Fire Ins. Co., 73 N.Y. 141, the courts have declared this to be a separate contract between insurer and mortgagee and not subject to most of the defenses which the insurer might have against the mortgagor."

This suggests the idea that so far as the separate contract between the workman and his dependents and the insurer is concerned the subject matter of the insurance may be the insurable interest which the workmen and their dependents have in the law's compulsion that where the relation of master and servant exists and the servant is engaged in the named extra hazardous employments the master shall pay compensation to the workman and/or his dependents if the workman suffers accidental injury in the course of his employment.

It must be remembered that in the policy under consideration the third party beneficiaries included the dependents of the workman, as well as the workman. Suppose the workman Points had merely been injured by the loss of a foot, instead of being killed. Could it be said that the subject matter of the contract had been destroyed? We think that all the appellee may properly contend for in the case at bar, even as to the named assured, is that the circumstance of the death of Points, prior to the acceptance of the application for insurance, materially affects the risk. Even if it could be said that the workmen

collectively listed on the payroll are the subject matter of the contract, which is very doubtful, it would require the destruction of the entire group fully to meet the analogy of a loss of a vessel or the destruction of a building by fire. If the payroll consisted of a thousand workmen, the injury and consequent death of one, though material to the risk, might not impel the insurer to decline the risk. The definitions of "subject of insurance" found in Words & Phrases, Third Series, page 214, lend support to this thought. They are:

"Where insurance policy provided if 'subject of insurance' be personal property an incumbrance thereon would render policy void, 'subject of insurance' means all property covered by policy, and chattel mortgage on a part only of such property would not avoid policy, rule that condition against incumbrances of insured property as entirety is not broken by incumbrance of part only applying. Western Assur. Co. v. Bronstein, 77 Colo. 408, 236 P. 1013, 1015.

" 'Subject of insurance' as used in condition of forfeiture in policy means a definite single subject that is, a house, one house, and not a house and other property. Northern Assur. Co., Limited of London v. Case, (C.C.A.N.C. [4 Cir.]) 12 F.2d 551, 554."

 Furthermore, under the rule of uberrimae fidei, even conceding that it applies in its full extent to fire insurance contracts, it seems that the same principles apply, whether the material circumstance is that the building has burned or is burning or is in immediate danger. Of course, one circumstance might affect the action of the insurance company more than another. It is not how much the circumstance material to the risk may pecuniarily affect the insurance company, but it is the fact that the insurance company before finally accepting the application has the right to be possessed of any knowledge material to the risk which the applicant has acquired during the period of negotiations prior to acceptance of the application in order that the insurance company may elect whether it will go on the risk notwithstanding. It is, of course, essential in order to vitiate the policy of insurance that the alleged misrepresentation or the concealment shall be of facts which are material to the risk. Whether such facts are material to the risk, this does not of itself alone determine the question of the validity of the policy. Such nondisclosure or concealment must be of facts material to the risk which are known to the assured and not known to the insurance company. This is not all. Before the policy can be vitiated, it must appear that the assured, knowing the facts, intentionally, willfully and fraudulently failed and refused to exercise due diligence in countermanding the application or otherwise notifying the company of such material facts. The decisions of the courts are at variance as to whether the element of intention to deceive the insurance company is an essential element of the so-called fraud neces-

sary to vitiate the policy. Some courts seem to hold that a negligent failure of the assured to make proper disclosures of material facts coming to his knowledge pending negotiations is sufficient to void the policy. These views probably turn upon whether active fraud by the assured is required or whether constructive fraud is sufficient.

While we think that what has been said heretofore is decisive, it may be worthwhile to point out that apparently the appellee sought to defeat the cause of action of appellant (dependents of the deceased workman) upon the ground of fraudulent concealment of facts material to the risk, and that the allegations of appellee's answer were appropriate to the charge of active, actual fraud.

In 32 C.J. 1293, § 320, it is said: "Good Faith. Good faith or the absence thereof on the part of the insured is immaterial as to the effect of a warranty and if it is shown to be false there can be no recovery upon the policy no matter how innocently the statement may have been made. However, there is authority to the effect that in an action by the company in equity for the cancellation of the policy, mere falsity of the statements and breach of warranties of the contract are alone insufficient to authorize relief upon the ground of fraud but insured must have had knowledge of their falsity and acted in bad faith." We need not take a position as to whether it is always necessary for the insurer seeking to avoid a policy on the ground of concealment by the insured to show that such concealment was with the design to deceive—we do no more than to construe the pleadings in the case at bar as presenting an issue of active fraud on the part of named assured.

In Hare & Chase v. National Surety Co., 2 Cir., 60 F.2d 909, 912, the court, in discussing the proposition as to whether a nondisclosure not inquired about shall be actually fraudulent in order to render the policy void, said: "Probably the rule requiring that fraudulent intent be proved to support the defense of concealment in fire and life insurance cases rests largely upon the fact that ordinarily the insured has not sufficient acquaintance with the insurance business to enable him to judge when the insurer will consider a fact material to the risk. [Citing cases.]" and proceeds with a statement which aids in distinguishing General Acc. F. & L. Assur. Corp. v. Industrial Acc. Com., 196 Cal. 179, 237 P. 33, relied upon strongly by appellee and hereinafter referred to. The court said: "Where the insured has paid premiums in reliance upon coverage, it would be harsh to disallow recovery on the policy if the insured neither knew nor ought to have known that he was guilty of suppressing information in whose existence the insured had a legitimate interest." The Court goes on to show that some situations require a stricter rule of disclosure than others.

Joyce on Insurance, § 1848, Couch Cyc. of Ins. Law, § 782, and 32 C.J. "Insur-

ance" § 487, are authority for the proposition that as to other than marine risks the policy of the law is to require that the nondisclosure of a fact which is not inquired about shall be fraudulent in the sense that the concealment alleged must have been a designed and intentional withholding of information.

How much more harsh it would be in a case like this to disallow recovery to the dependents of the deceased merely because the employer failed to properly appraise the situation and disclose with promptitude knowledge he may have thought to be immaterial.

Ordinarily a pleader is not to be held to his pleadings with an extreme degree of strictness, and sometimes certain allegations may be regarded as surplusage. But in this case, where a nondisclosure is relied upon to defeat the policy of insurance in favor of a third party beneficiary and the rules as to whether the nondisclosure must have been intentional and actually fraudulent being somewhat obscure, we think we may rely on the defendant's view of the law as reflected in its answer as controlling upon it in our consideration of the evidence and the findings of the court. The defendant as to the concealment relied upon alleged that the named assured, W. O. Wills, Jr.:

"*Willfully, intentionally* and *fraudulently* concealed the fact of said death from said representative and this company; that two days after such alleged death and without notice of the same the Pioneer Mutual Compensation Company was allowed and induced because of such *fraudulent concealment* by the employer, W. O. Wills, Jr., to issue a policy of insurance under the circumstances set out in Paragraph IV of the First Answer by Way of New Matter herein;

"That the fact of said death was unknown to Pioneer Mutual Compensation Company and could not have been discovered at the time said policy was issued, and this fact was also known to said W. O. Wills, Jr."

What is the evidence produced to support these allegations? All that appears is the following from the cross-examination of appellant's witness Schossow, who had testified as to taking the injured workman Points in an automobile to Duncan, Arizona, in search of medical attention, the death of Points en route, and the subsequent trip to the undertaking parlor at Lordsburg, New Mexico:

"Q. Did you call Mr. Wills on that trip? A. Yes.

"Q. Where did you telephone him from? A. Duncan.

"Q. And you told him that Mr. Points had been killed in the accident? A. Yes.

"Q. What time of the afternoon did you call Mr. Wills from Duncan? A. It must have been between one and two o'clock, somewheres in there."

It does not appear where Mr. Wills was when the telephone conversation took place.

In Springfield Fire & Marine Ins. Co. v. National Fire Ins. Co., C.C.A., 8 Cir., 51 F.2d 714, 715, 76 A.L.R. 1287, the court decided: "Uberrimae fidei rule does not require insured to use extraordinary diligence or to employ extraordinary means to inform insurer of changes in risk which have taken place during negotiations and before policy has attached." To the same effect, see 6 Couch Cyc. of Ins. Law, § 1331, note 9, where it is said: "If a person who has directed the procurance of marine insurance at a distant point receives intelligence of a loss of the insured property before his order is executed, he should countermand the policy, or transmit the intelligence by the earliest and most expeditious route of mercantile communication, although it is not obligatory on him to resort to an unusual and extraordinary mode of transmission."

All we know from the evidence above quoted is that Mr. Wills had access to a telephone. We are not able to say that it was obligatory upon Mr. Wills to use telephonic or telegraphic communication. There is no evidence from which it could be determined when a letter mailed, even on the afternoon of the 6th of December at the place where Mr. Wills then was, would reach Santa Fe. It seems to be conceded by defendant that information communicated in due course to the insurer after the *acceptance of the risk* on the 8th of December would not affect the rights of the dependents of the workman Points. It also appears that the company's agent

Reynolds was negligent in forwarding the application promptly. The following colloquy between counsel for the insurance company and its agent, Mr. Reynolds, who was called as a witness in its behalf shows this:

"Q. You feel certain it was the 6th instead of the 7th day of December that the application reached you? A. Yes, sir.

"Q. You held it in your office, then, one day before you forwarded it to the company in Santa Fe? A. Yes, I remember that, that is the reason I remember, it must have been the sixth because I know it was mailed next day."

It cannot be doubted that it was the duty of the agent to forward the application promptly, and it is inherently probable that if it had been mailed on the sixth instead of the seventh of December the application would have been received and accepted in Santa Fe on the seventh instead of the eighth. This being so, the time for effective communication by Mr. Wills after receiving information on the afternoon of the 6th of December with the office of the insurer in Santa Fe would be reduced to probably less than twenty-four hours. As we have said, there is no evidence as to where Mr. Wills was when he received the telephone message, nor any evidence as to the mail schedules to establish when a letter mailed on the 6th of December would arrive in Santa Fe. We regard the evidence as insufficient to es-

tablish any actual or active fraud, and as unsatisfactory to establish negligence on the part of the employer Wills.

 It must be remembered that in the case at bar it was strongly urged by appellant that Mr. Reynolds, the agent of the insurance company at Lordsburg, who solicited the insurance and who received the application and the premium, was the general agent of the insurance company. Mr. Reynolds testified that he thought he was a general agent. It is true that the trial court found otherwise and that Reynolds' authority did not permit him to make a contract of insurance. So far as the employer Wills is concerned, it may be proper to inquire whether that matter was so clear as a question of law and fact that he may not have honestly believed that he could rely upon coverage for his employees when he had responded to the solicitations of the agent Reynolds by executing the application furnished to him and paying the premium. The employer may have made a mistake of fact or law or both. We know that it is sometimes loosely said by courts and text writers that everyone is presumed to know the law. It may be doubted if there is such a presumption. The declaration many years ago of Lord Mansfield is as true now as then. He said: "It would be very hard upon the profession if the law was so certain that everybody knew it; the misfortune is that it is so uncertain that it costs much money to know what it is, even in the last resort." Said Mr. Justice Maule, in Martindale v. Falkner, 2

C.B. 719, 52 R.C.L. 719: "There is no presumption in this country that every person knows the law; it would be contrary to common sense and reason if it were so." In speaking of the maxim, Mr. Justice Campbell of the Michigan Supreme Court (Black v. Ward, 27 Mich. 191, 15 Am.Rep. 162) observed: "But the maxim referred to in regard to knowledge of the law is misapplied. No man can avoid a liability, as a general thing, because he is ignorant of the law. This is an essential rule of society. But the law is not so senseless as to make absurd presumptions of fact." And says Mr. Elliott in his work on Evidence, Vol. 1, § 96: "But it is a perversion of the maxim that ignorance of the law is no excuse to say that everyone is, under all circumstances, presumed to know the law."

The foregoing quotations are taken from the concurring opinion of Mr. Justice Straup in State ex rel. Utah Savings & Trust Co. v. Salt Lake City, 35 Utah 25, 99 P. 255, 261, 18 Ann.Cas. 1130, who remarked: "Ignorance of the law will not relieve one from, nor excuse him of, the legal consequences of his wrongful or negligent acts; nor will it relieve him from the legal effect of his contract obligations. It is only in respect of such matters that the maxim is applicable, and it is only in such sense that it may be said every one is presumed to know the law." Mr. Justice Straup went on to say: "Nor do I agree with the statements, loosely made by some courts, and with the principle intimated in the opinion of the ma-

jority members of the court, that relief cannot be given on the ground of mistake or misapprehension of the law. * * * It is not necessary now to go into the particulars to ascertain when relief will be granted in such case. It is enough to know that the maxim is not so broad that ignorance or mistake of the law is no ground for either defensive or affirmative relief. It is not even so broad in its application that a mistake of law cannot be shown to ascertain the state of one's mind or motive."

Furthermore, if Mr. Wills made a mistake in appraising the situation as not calling upon him for the performance of a duty immediately, such mistake may have been one of fact and not of law.

We indulge this discussion for no other purpose than its bearing possibly upon Mr. Wills' state of mind or motive and consequently the presence or absence of bad faith in his failure to communicate promptly with the insurance company the information he had received concerning Mr. Points' death.

The inquiry arises whether Mr. Wills was obliged to communicate with the insurer prior to ascertaining sufficient details of the accident as to render it probable that a claim against him as employer, and the insurance company as insurer, would arise therefrom. Did the death resulting from injury by accident "arise out of and in the course of his employment"? § 156-102, N.M.S.A.1929. Was the injury occasioned by intoxication of such work-

man? § 156-108, N.M.S.A.1929. If investigation brought a negative answer to either of these inquiries, the death was not within the coverage afforded by the policy. In other words, was he compelled to communicate the fact of death to the insurer forthwith without any opportunity to ascertain details which would render likely liability on his part as employer and its part as insurer? Must he prejudge, without information or knowledge on the subject, the question of his own liability and the materiality of the circumstance? If he may so investigate, how long would it take to do so and how long did it take? The record is silent.

If the circumstances above mentioned may be to a degree excusatory of Mr. Wills in a contest between him as the named assured and the insurance company, all the greater reason exists for the application of the principles underlying the "union" or "standard" mortgage clause as expounded by a strong majority of the courts to the end that the workman and his dependents in the situation of the case at bar shall not be deprived of the protection which the law designs for them because of mistakes or mere inattention of his employer in the performance of a duty.

We have gone into the matter of the alleged fraud of the employer Wills because we do not wish to anticipate a decision not necessary to a disposition of the problem here presented, and because the present case shows how injurious it would be to defeat the rights of the dependents

of the deceased workman upon charges of fraud so tenuously supported.

In this connection we deem it advisable to refer to a case heavily leaned upon by appellee, namely, General Acc. F. & L. Assur. Corp. v. Industrial Acc. Com., supra. In that case the employer was uncertain whether he would take out insurance. He was impressed with the importance of industrial accident coverage, but, being hardpressed for finances, he was considering whether he would be able to pay the premium on a policy of insurance. He was also apprehensive that a declining oil market might at any time cause a suspension of the industry upon which he depended for employment, thereby rendering an outlay of money for an insurance policy an unnecessary expenditure. It appears that on the 26th of July, 1922, he visited the office of certain insurance agents with the apparent purpose of making inquiry as to the cost of a policy of insurance. Certain discussions and negotiations were had, but no application was signed. An unsigned application was made up and sent by the agents to the other parties authorized to write insurance, together with a letter inquiring as to the rate as well as the minimum premium deposit required. On July 28, 1922, a policy complete in form and detail was received by the insurance agents from the general office with information concerning the premium. The agents notified the employer of the receipt of the policy but said employer did not consent to accept the policy. It was understood that the policy should be held by the agents for a few days to give the employer further time for making a decision as to whether he would pay the premium and accept the policy. The matter drifted along without further development until August 12th, on which day at the hour of 3:30 o'clock one Lindquist, who worked for the employer in question, received the injuries from which he died. On the afternoon of the same day the employer presented himself in the office of the insurance agents and paid the premium required to secure the policy. The agents then and there delivered to the employer the policy of insurance. The conversation at this visit was brief; no mention was made of the accident having occurred. The portion of the opinion relied upon by the appellee in the case at bar is as follows [196 Cal. 179, 237 P. 37]: "It is the contention or suggestion of respondent Commission that the dependents of the employee have an enforceable right against petitioner under the alleged policy, even though the employer be cut off from any remedy against petitioner. We are unable to understand what principle of law would give the dependents of the employee a cause of action against petitioner upon a contract which is void or voidable as to the employer." Because of the strong reliance of the appellee upon that case, we have taken the pains to make inquiry concerning the manner of its presentation, and we are advised that the respondent commission in support of its contention above referred to cited only 2 Cooley's

Briefs on Insurance, §§ 1227–1231, and urged that the factual situation presented should be regarded as analogous to the mortgagor-mortgagee insurance relationship. In reply to this contention and in support of the negative disposition of the issue, the insurance carrier, as petitioner seeking to annul the award, contended in opposition to the commission's argument that there was no provision in the policy which made the situation analogous to that of the mortgagor-mortgagee relationship and our inquiry discloses that the failure of the commission in the reply brief to refer the court to a policy provision analogous to the standard mortgage clause indicates that none existed in the particular policy there involved.

So it appears that that case is readily distinguishable from the case at bar, as are others cited by appellee. We have read many decisions which support the view we have taken of the matter which we deem unnecessary to cite. The student will find in Citizens State Bank v. State Mut. Rodded Fire Ins. Co., 276 Mich. 62, 267 N.W. 785, many of the more important decisions collected.

Only the importance of the question and the vigorous brief of able counsel for appellee have seemed to warrant an opinion of this length.

The motion for rehearing should be denied, and it is so ordered.

BRICE, ZINN, SADLER, and MABRY, JJ., concur.