1998-NMCA-038

956 P.2d 816

**HASSE CONTRACTING COMPANY, INC. Plaintiff–Counterdefendant– Appellee,**

v.

**KBK FINANCIAL, INC. Defendant– Counterclaimant–Appellant,**

and

**Gosney & Sons, Inc., Defendant– Counterclaimant–Appellee.**

No. 17745.

Court of Appeals of New Mexico.

Oct. 17, 1997.

Certiorari Granted Feb. 26, 1998.

Richard D. Yeomans, Guebert & Yeomans, P.C., Albuquerque, for Plaintiff–Counterdefendant–Appellee.

Gordon S. Little, Gordon S. Little, P.A., Albuquerque, for Defendant–Counterclaimant–Appellant.

Michael H. Hoses, Miller, Stratvert, Torgerson & Schlenker, P.A., Albuquerque, for Defendant–Counterclaimant–Appellee.

## OPINION

BUSTAMANTE, Judge.

1. This interpleader action, arising from a public construction project, involves a disputed fund claimed by a materialman and a secured finance company which loaned money to one of the subcontractors on the project. KBK Financial, Inc. (KBK), the factor,

appeals a summary judgment which determined that the materialman should be paid from the interpleaded fund before KBK. We affirm.

*STANDARD OF REVIEW AND APPLICABLE LAW*

2. When reviewing a grant of summary judgment, appellate courts view the evidence in the light most favorable to the party opposing the motion. That is, we review the evidence in support of the right to a full trial on the merits. *Sarracino v. Martinez,* 117 N.M. 193, 194, 870 P.2d 155, 156 (Ct.App. 1994). When there is conflicting evidence, or the evidence supports conflicting inferences, summary judgment is improper. *Id.* Summary judgment should be granted only when a party is entitled to judgment as a matter of law. *Id.*

3. KBK asserts that we should apply Texas law because the contract was accepted in Texas, citing *Orcutt v. S & L Paint Contractors, Ltd.,* 109 N.M. 796, 791 P.2d 71 (Ct.App.1990). However, in its reply brief, KBK recognizes that Texas and New Mexico have adopted similar versions of Article Nine of the Uniform Commercial Code governing secured transactions, and further asserts that the result in this case would be the same under either state's law. Given this concession, we do not address KBK's conflict of laws issue directly. Instead, we analyze the case as a matter of New Mexico law.

*FACTS AND PROCEEDINGS*

4. Hasse Contracting Company, Inc. (Hasse) subcontracted with Corn Construction to do much of the concrete work on a state highway project located in San Juan County (the project). Hasse's work included concrete for certain bridges, drainage structures, and retaining walls. Hasse entered into an agreement with Hilfiker Systems, Inc. (Hilfiker) in June 1994 for supply of some of the materials. Under the agreement, Hilfiker agreed to deliver precast concrete panels to the project at a specified unit price.

5. The agreement between Hasse and Hilfiker was memorialized on a printed purchase order form supplied by Hasse (Purchase Order). The reverse side of the Purchase Order recited conditions of the agreement. The only provisions relevant to the issues in this case are numbers 1, 3, and 5. We quote them in pertinent part as follows:

(1) **Compliance with General Contract Provisions:** Insofar as they are not inconsistent with the terms and conditions of this order, the general conditions and provisions of the general contract for which the material covered hereby is to be supplied are incorporated herein by reference and made a part hereof as fully as if written herein.

. . .

(3) **Releases:** The Seller agrees to furnish waivers or releases from his material men or other suppliers for the purchases represented on this order upon request by the general contractor.

. . .

(5) **Assignment:** The supplier or vendor shall not assign this purchase order nor any interest therein without first obtaining the written consent of the contractor, nor shall the supplier or vendor assign or attempt to assign any funds accrued or to accrue under this purchase order without first obtaining the written consent of the contractor and no such assignment shall be binding on the contractor unless and until accepted in writing by the contractor.

6. Hilfiker, a Texas company, entered into an agreement with Gosney & Sons, Inc., a Colorado corporation (Gosney) to actually manufacture and deliver the precast concrete panels to the job site. Hasse asserts that Hilfiker's arrangement with Gosney was a violation of paragraph five of the Purchase Order, in that Hilfiker did not notify Hasse of the subcontract and did not seek its permission.

7. Gosney performed under its agreement with Hilfiker, delivering acceptable precast concrete panels to the job site in January and February of 1995. Aware of the delivery of the acceptable panels, Hilfiker invoiced Hasse on or about February 14, 1995, in the amount of $55,924. The invoice

was apparently incorrect, but the parties do not dispute that, when the per unit cost was applied, the correct price for the material delivered was $49,004.58, the amount interpleaded by Hasse.

8. On February 14, 1994, prior to the agreement with Hasse, Hilfiker executed a Factoring Agreement with KBK. There is no dispute in the record that KBK is "engaged in the business of purchasing accounts receivable from those persons or firms rendering services to others[.]" Under the Factoring Agreement, Hilfiker agreed to sell to KBK its accounts receivable up to an aggregate amount of $275,000.

9. Paragraph two of the Factoring Agreement, provided as follows:

All accounts purchased by KBK shall be purchased without recourse against the Seller as to the financial ability of the customers to pay, and all losses from financial inability of the customers to pay such accounts shall be KBK's sole responsibility in the absence of any breach by the Seller of the warranties, covenants and guarantees set forth.

The Factoring Agreement further required Hilfiker to sell, transfer, and assign to KBK all of Hilfiker's rights in accounts accepted by KBK, and Hilfiker was required to execute and deliver to KBK "such notices of assignment and other documents ... as KBK may request to better protect the sale and assignment of accounts hereunder." Hilfiker and KBK executed a financing statement which is valid on its face. The financing statement was filed with the Texas Secretary of State on February 22, 1994.

10. There is no dispute in the record that Hasse was not aware of the Factoring Agreement between Hilfiker and KBK when the Purchase Order was executed. It is also uncontested that Hasse first became aware of the assignment to KBK of Hilfiker's account receivable on March 7, 1995, when Hasse received by facsimile transmission a letter from KBK giving notice that KBK was exercising its rights under the Factoring Agreement and the Uniform Commercial Code to demand that "Hilfiker's Systems, Inc.'s Customers make all future payments directly to KBK."

11. Hasse had not made any payments to Hilfiker prior to March 7, 1995, when it received the demand from KBK. In March 1995, Hilfiker filed for bankruptcy pursuant to a chapter seven liquidation petition. Hilfiker did not pay Gosney. On March 10, 1995, it also made a specific assignment of the Hasse receivable to KBK. On April 19, 1995, Gosney placed Corn Construction, the general contractor, on notice that it had furnished materials to the project in the amount of $50,840. Gosney gave notice that unless full payment of the amount due was received within five days of the letter, Gosney would bring an action "upon the contract payment bond provided in connection with the Project by Corn Construction Company as general contractor." As required by New Mexico's Little Miller Act, NMSA 1978, §§ 13-4-18 to -20 (1923, as amended through 1987), a payment bond had been provided for the project.

12. Under the payment bond, the surety would be responsible for paying Gosney. The bond required Corn Construction as the general contractor to indemnify the surety for payments made under the fund to materialmen. In turn, Hasse's contract with Corn Construction required Hasse to indemnify Corn Construction for any cost and expenses Corn Construction might incur satisfying the claims of any materialmen to the project. Faced with the prospect of paying twice for the concrete work, Hasse refused to pay KBK pursuant to its demand, and instead filed its complaint for interpleader joining Hilfiker, KBK, and Gosney.

*ANALYSIS*

13. KBK views the case as a simple matter of priority under the Uniform Commercial Code (UCC). Its theory is that it is entitled to the funds payable to Hilfiker because pursuant to the Factoring Agreement and financing statement it is a secured party possessed of a perfected security interest superior to all other claims to the fund. KBK asserts it is entitled to the funds free and clear of any claim by Gosney because the agreement between Hasse and Hilfiker (1) does not "allow Hasse to pay Gosney rather than Hilfiker" and (2) does not contain any

requirement that Hilfiker pay its material-men and suppliers, either prior to or as a condition to Hasse's payment to Hilfiker.

14. KBK would require Hasse to pay it as assignee even if such a payment would essentially guarantee that Gosney would not get paid from the fund since Hilfiker is in bankruptcy and KBK has no obligation under the Factoring Agreement or the UCC to satisfy Hilfiker's obligations. *See* NMSA 1978, § 55–9–317 (1961). From a practical standpoint, acceptance of KBK's position would result in Hasse creating a claim against itself since the project surety or the general contractor would seek reimbursement for payments made to Gosney under the payment bond.

15. Hasse and Gosney dispute KBK's status as a secured party. They assert variously that: (1) the assignment by Hilfiker to KBK was improper under Hilfiker's contract with Hasse; (2) the subcontract between Hilfiker and Gosney was a breach of Hilfiker's contract with Hasse; (3) the assignment to KBK was actually a partial satisfaction of a pre-existing debt rather than a secured transaction; (4) even if the assignment to KBK was effective, KBK took subject to all defenses, set-offs, and counterclaims Hasse might have; and (5) Gosney's claim to the funds is in any event superior because of its status as a materialman to the project.

16. We first review KBK's status. KBK is a secured party within the meaning of the UCC pursuant to the Factoring Agreement and its financing statement. It cannot be reasonably doubted that KBK is in the business of lending money, and that it secures its loans by means of instruments intended to create a security interest in its customer's accounts receivable. Further, Hilfiker's claim against Hasse for payment is an account within the meaning of the UCC. NMSA 1978, § 55–9–106 (1985, prior to the 1996 and 1997 amendments). The transaction thus meets the principal test for coverage by Article Nine. NMSA 1978, § 55–9–102(1)(a) (1985). The Factoring Agreement creates an obligation to repay advances made under its provisions, and the assignment of accounts described in it serves as security for the obligation. *Id.* cmt. 2.

17. Even if there is a question concerning application of Section 55–9–102(1)(a), the transaction is covered by Section 55–9–102(1)(b) which applies to "any sale of accounts or chattel paper." As noted in comment two to Section 55–9–102: "Commercial financing on the basis of accounts and chattel paper is often so conducted that the distinction between a security transfer and a sale is blurred, and a sale of such property is therefore covered by Subsection (1)(b) whether intended for security or not, unless excluded by Section 9–104."

18. Gosney and Hasse assert that Article Nine does not apply because the March 1995 assignment by Hilfiker to KBK was no more than a "transfer of a single account to an assignee in whole or partial satisfaction of a preexisting indebtedness," relying on NMSA 1978, § 55–9–104(f) (1992, prior to 1997 amendment). Under the circumstances of this case, no reasonable person could view Hilfiker's business relationship with KBK as a single transaction. The terms of the Factoring Agreement and the financing statement describe a normal and ongoing factoring arrangement. As noted above, it is undisputed that KBK advanced funds on the strength of payment to be made in the future. Thus, it cannot be reasonably disputed that under the Factoring Agreement KBK was undertaking a risk for which Hilfiker's accounts receivable stood as security. Simply because Hilfiker did not call on the Factoring Agreement more frequently does not negate the plain terms of the arrangement.

19. Similarly, the fact that KBK demanded and received a specific assignment of the account does not convert the arrangement into single transaction "hav[ing] nothing to do with commercial financing transactions." *Id.* cmt. 6. The March 1995 assignment is best characterized as the final self-help step in KBK's collection on the obligation from Hilfiker. Acceptance of Hasse's and Gosney's position would undermine the ability of secured parties to conduct self-help repossession and collection procedures allowed by NMSA 1978, § 55–9–502 (1985).

20. We turn now to the applicability of NMSA 1978, § 55-9-318 (1985)—the primary issue in this case. We address Section 55-9-318(4) first. It provides:

> A term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of a security interest in a general intangible for money due or to become due or requires the account debtor's consent to such assignment or security interest.

Having already determined that the transaction between Hilfiker and KBK was intended to, and did create a security interest, Section 55-9-318(4) nullifies paragraph five of the Purchase Order to the extent it seeks to disallow assignments for purposes of creating a security interest in the account. Thus, Hilfiker's assignment to KBK of its account with Hasse is unaffected by Hasse's attempted limitation. *Id.* cmt. 4.

21. The more difficult, and interesting, question is presented by Section 55-9-318(1) which provides:

> Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a sale as provided in Section 9-206 [55-9-206 NMSA 1978] the rights of an assignee are subject to:
>
> (a) all the terms of the contract between the account debtor and assignor and any defense arising therefrom; and
>
> (b) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

Section 55-9-318(1) recognizes the general common-law rule that an assignee's interest is subject to all conditions, contingencies, limitations, defenses, and/or set-offs which may be asserted by the account debtor against the assignor. *See Associates Loan Co. v. Walker,* 76 N.M. 520, 522-23, 416 P.2d 529, 530-31 (1966); *see also* § 55-9-318 cmt. 1.

22. Hasse asserts that it has at least two defenses against Hilfiker's claim for payment: (1) Hilfiker's delegation to Gosney of its obligation to perform under the purchase order was in breach of paragraph five of the Purchase Order; and (2) Hilfiker has a duty under paragraph one and three of the Purchase Order to pay, or assure payment to, its materialmen and suppliers before Hasse is required to pay Hilfiker.

23. KBK does not respond directly to Hasse's and Gosney's argument under Section 55-9-318(1). That is, it does not assert that as a secured creditor with a perfected security interest upon which it has foreclosed through self-help measures, it takes Gosney's rights to payment free and clear of any defenses or set-offs Hasse might assert. KBK argues only that there has been no breach and that there are no defenses or set-offs upon which Hasse can rely.

24. We believe Hilfiker's involvement of a third party to perform work for the project, and its failure to pay its supplier Gosney, carry implications for KBK's claim, though not precisely for the reasons argued by the parties.

25. We agree with the essence of KBK's position as to the first asserted breach described above. Paragraph five of the Purchase Order does seek to prohibit Hilfiker from assigning the Purchase Order or "any interest therein" without consent from Hasse. For purposes of this discussion, we assume Hasse meant to prevent its subcontractors from delegating their obligation to perform, even if there was no intent or attempt to escape their ultimate duty under the Purchase Order. Hilfiker's arrangement with Gosney can be viewed as at least a technical breach of paragraph five.

26. However, there is no contention that Hasse did not receive acceptable performance from Hilfiker, albeit through its supplier Gosney. Thus, Hasse would not have any basis on this record to refuse payment simply because someone other than Hilfiker did the actual work. In addition, Hilfiker's technical non-compliance with the Purchase Order did not result in anything other than nominal damage to Hasse. *See* Restatement (Second) of Contracts § 346 (1981); 5 Arthur Linton Corbin, *Corbin on Contracts* § 1003 (1964). Absent Hilfiker's insolvency, and Hasse's knowledge that Gosney would not be paid by Hilfiker or KBK, Hilfiker would have

been entitled to payment in the ordinary course of business. *See Shaeffer v. Kelton,* 95 N.M. 182, 186, 619 P.2d 1226, 1230 (1980) (substantial performance in good faith will permit recovery on construction contract); *Viking Communities Corp. v. Peeler Constr. Co.,* 367 So.2d 737, 739 (Fla.Dist.Ct.App.1979) (technical breach without damage is consistent with substantial performance).

27. KBK also correctly points out that the Purchase Order does not by its terms require payment of suppliers as a condition precedent to satisfaction of Hilfiker's invoice. Paragraph three of the Purchase Order simply requires Hasse's subcontractor to produce lien waivers on request. There is no indication in the record that Hasse invoked the provisions of paragraph three before refusing to pay Hilfiker or KBK. Paragraph one does generally incorporate the terms of the contract between the owner (the State) and the general contractor (Corn Construction) to the Purchase Order. We need not, however, resolve in this case to what extent, if any, incorporation of the contract may support one party or the other. Even if the Purchase Order did not explicitly support Hasse's and Gosney's position, that fact would not mean that KBK would be entitled to win. This case is not a contest between Article Nine secured parties that is governed by normal priority rules and nothing else. Gosney's claim as a materialman is grounded on public policy reflected in statutory provisions and arises by operation of law.

28. We believe an obligation to pay materialmen and suppliers should be implied in the Purchase Order, and, indeed, in all construction contracts subject to New Mexico's materialmen's lien statute or Little Miller Act. We agree with the Arizona Court of Appeals when it stated: "In view of the Arizona statutory provisions establishing materialmen's lien rights, the contractual obligation of the subcontractor to 'supply' materials must be construed as including an obligation on the subcontractor's part to pay for the materials so as to preclude the establishment of lien rights against the property." *Business Fin. Servs., Inc. v. Butler & Booth Dev. Co.,* 147 Ariz. 510, 711 P.2d 649, 651–52 (Az.Ct.App.1985) (holding that a general con-

tractor could make payments to suppliers engaged by a subcontractor even after receipt of notice from a secured assignee) (citation omitted). New Mexico has enacted a similar materialman's lien provision. *See* NMSA 1978, § 48–2–2 (1993). Thus, we conclude that pursuant to Section 55–9–318(1)(a), Hasse could assert Hilfiker's past and prospective failure to pay Gosney as a defense or set-off under the Purchase Order, allowing Hasse to retain and interplead the funds.

29. We recognize that Section 48–2–2 does not apply to this case directly because this was a public works project, and public property cannot be subjected to a materialmen's lien under Section 48–2–2. However, the project was covered by a Little Miller Act performance and payment bond pursuant to Sections 13–4–18 to –20. The Little Miller Act is designed to provide in the public contracts arena a remedy similar to the statutory materialmen's lien. *See State ex rel. W.M. Carroll & Co. v. K.L. House Constr. Co.,* 99 N.M. 186, 187–88, 656 P.2d 236, 237–38 (1982). The purpose of the Little Miller Act is to protect suppliers, including so-called third-tier suppliers, in public construction projects. *Id.; see also State ex rel. Elec. Supply Co. v. Kitchens Constr., Inc.,* 106 N.M. 753, 755, 750 P.2d 114, 116 (1988). Even though there is no lien provision attached or included in the Little Miller Act, the public policy goals are the same. We see no reason to treat materialmen and suppliers on public versus private projects differently for purposes of determining their priority to retained funds intended to be used to pay project costs.

30. Our conclusion is consistent with cases in other jurisdictions enunciating the rule that, in the absence of a specifically contrary statute, materialmen take precedence over assignees when distributing retained funds. Of these cases, the most closely related by fact pattern is *Farmers Acceptance Corp. v. DeLozier,* 178 Colo. 291, 496 P.2d 1016 (1972) (en banc). *DeLozier* began as an action by a materialman against a general contractor to recover the costs of materials supplied to the project through a subcontractor. *Id.,* 496 P.2d at 1017. The

general contractor had already paid the subcontractor and its assignee but they had failed to pay the materialman. *Id.* The general contractor filed a third party complaint seeking reimbursement from both of them. *Id.* In affirming a judgment in favor of the general contractor and against the assignee, the Colorado Supreme Court noted that the assignee could acquire nothing more than the subcontractor was entitled to under the contract. *Id.* at 1018. The court held that the subcontractor's rights to payment was conditioned upon performance of the actual work and "subject to the burden of all the material bills incurred by [the subcontractor] in the performance of the contract." *Id.*

31. While the *DeLozier* case has been the subject of some criticism, the criticism has been limited to *DeLozier*'s allowance of affirmative relief against the lender once the lender had already been paid. *See Michelin Tires v. First Nat'l Bank*, 666 F.2d 673, 678–80 (1st Cir.1981); *Lawson State Community College v. First Continental Leasing Corp.*, 529 So.2d 926, 930–33 (Ala.1988), *overruled on other grounds by Berner v. Caldwell*, 543 So.2d 686, 688 (Ala.1989); *H. John Homan Co. v. Wilkes–Barre Iron & Wire Works, Inc.*, 233 N.J.Super. 91, 558 A.2d 42, 44–46 (App.Div.1989); *Irrigation Ass'n v. First Nat'l Bank*, 773 S.W.2d 346, 349–51 (Tex. App.1989); *Lydig Constr., Inc. v. Rainier Nat'l Bank*, 40 Wash.App. 141, 697 P.2d 1019, 1022 (1985). In our case, the lender was not paid, and at least two of the above cases note that a different result is present when the suppliers make their claims against the lenders or contract obligors or both as a defensive matter. *See Michelin Tires*, 666 F.2d at 673; *H. John Homan Co.*, 558 A.2d at 44.

32. *General Electric Supply Co. v. Epco Constructors, Inc.*, 332 F.Supp. 112 (S.D.Tex. 1971) and *Panhandle Bank & Trust Co. v. Graybar Elec. Co.*, 492 S.W.2d 76 (Tex.Civ. App.1973) both decided under Texas law, are to the same effect as the *DeLozier* case. Both cases involve disputes between secured assignees and materialmen on projects. *General Elec. Supply Co.* involved a public works contract, thus invoking the Texas version of New Mexico Little Miller Act. *Pan-*

*handle Bank & Trust Co.* appears to have been a private contract and involved a Texas version of our materialmen's act. While both cases, as noted by KBK, are dependent to some degree on statutory provisions, both of them also clearly state that the statutory provisions are simply reflective of the preferred position of materialmen and suppliers. Both cases state that the UCC did not diminish the preferred position of materialmen over assignee money lenders. *General Elec. Supply Co.*, 332 F.Supp. at 115; *Panhandle Bank & Trust Co.*, 492 S.W.2d at 81. *See also Jensen v. First City Nat'l Bank*, 616 S.W.2d 452, 454 (Tex.Civ.App.1981) (distinguishing *Panhandle Bank & Trust Co.* on the ground of a specific statute exempting banks from the operation of the materialmen's act).

33. The public policy preference for materialmen was aptly summarized as follows by the Utah Court of Appeals:

> Given the legislature's creation of a specific statutory preference for mechanics' lienholders, if the question is framed as a choice between which party should receive a windfall, we believe it should be the mechanics' lienholder.... Given the statutory protection granted mechanics' lienholders, it is much more appropriate to have commercial lenders bear the burden of protecting themselves.

*Richards v. Security Pac. Nat'l Bank*, 849 P.2d 606, 612 (Utah Ct.App.1993).

34. Our decision also reflects and supports general expectations in the construction industry. Economic viability of the industry requires that payments made by the owner are properly applied down the line in order to assure performance and an unburdened final product. To support this multitier payment system " 'courts and legislatures have increasingly found that the parties have an independent legal duty arising from reasonable commercial expectations to see to the proper application of construction funds.' " *In re Davidson Lumber Sales, Inc.*, 66 F.3d 1560, 1566 (10th Cir.1995) (quoting *Selby v. Ford Motor Co.*, 590 F.2d 642, 648, (6th Cir.1979)).

*CONCLUSION*

35. KBK held a properly perfected security interest in Hilfiker's right to payment. However, KBK could take no more than Hilfiker owned. Hilfiker's claim to payment was reasonably subject to the requirement that it pay its suppliers for the project. In this situation, where it was clear that Gosney would not be paid by Hilfiker or KBK, thus subjecting Hasse to potential double liability, it was appropriate to resolve the contest to the fund in a manner calculated to provide maximum protection to the materialman. The summary judgment is affirmed.

36. **IT IS SO ORDERED.**

PICKARD and WECHSLER, JJ., concur.