2002-NMCA-011

39 P.3d 704

Michael GALLEGOS, Plaintiff–
Garnishor–Appellee,

v.

Robert ESPINOZA, Sr., Eagle Eye Con-
struction, Inc., a New Mexico Corpora-
tion, Robert Espinoza, Jr., and Benito
Espinoza, Defendants,

Armstrong Construction Co.,
Garnishee–Appellant.

No. 21,298.

Court of Appeals of New Mexico.

Nov. 21, 2001.

Certiorari Denied, No. 27,296,
Jan. 29, 2002.

Peter V. Culbert, Santa Fe, NM, for Ap-
pellee.

David C. Henderson, Santa Fe, NM, for
Appellant.

Sean Calvert, Calvert & Menicucci, Albu-
querque, NM, Amicus Curiae American Sub-
contractor Association.

Linda Zemke, Gardner & Zemke Co., Al-
buquerque, NM, Amicus Curiae Associated
Builders and Contractors, Rio Grande Chap-
ter.

David Gorman, Sheehan, Sheehan & Stel-
zner, Albuquerque, NM, Amicus Curiae As-
sociation of General Contractors of New
Mexico.

## OPINION

BOSSON, Chief Judge.

{1} A general contractor on a public works
project owes payments to its subcontractor
who, in turn, owes money to various suppli-
ers. The subcontractor also owes an unrelat-
ed debt on a judgment. The judgment credi-
tor obtains a writ of garnishment against the
general contractor demanding that, instead
of paying the subcontractor, it pay the judg-
ment creditor. We discuss the circum-
stances under which the garnishee-general
contractor may raise defenses against the
garnishor-judgment creditor that the gar-
nishee had under its contract with the sub-
contractor, whose unpaid judgment debt has
caused the garnishment. The district court

granted summary judgment in favor of the garnishor. We reverse and hold that the general contractor's contractual defenses prevail against the writ of garnishment.

## BACKGROUND

{2} On April 29, 1999, Armstrong Construction Co. (Armstrong) contracted with the New Mexico State Highway and Transportation Department to make improvements on State Highway 18, near Eunice, New Mexico (the Project). On June 17, 1999, Armstrong subcontracted with Eagle Eye Construction, Inc. (Eagle Eye) to install a fence as part of the Project (the Subcontract). The Subcontract provided that Armstrong would make progress payments to Eagle Eye within ten days after receipt of funds from the State and final payment including retainage within twenty days. Eagle Eye, in turn, contracted with other businesses for supplies to use on the Project.

{3} Meanwhile, unknown to Armstrong, Michael Gallegos filed an unrelated lawsuit against Eagle Eye for collection of a private debt and for fraud. On August 24, 1999, Gallegos obtained a default judgment in the First Judicial District Court, which awarded Gallegos $212,422 in compensatory and punitive damages against Eagle Eye. A transcript of the judgment was issued on August 24, 1999, and recorded in Santa Fe County on August 31, 1999. Attempting to collect on his judgment, on October 22, 1999, Gallegos served a writ of garnishment on Armstrong in regard to any payments Armstrong owed Eagle Eye as part of the Subcontract.

{4} Armstrong answered the writ asserting that it owed $28,464.26 to both Eagle Eye and Eagle Eye's suppliers. The district court ordered the $28,464.26 paid into the court registry. Some of Eagle Eye's suppliers intervened below, but most did not.

{5} The district court granted summary judgment to Gallegos on the writ of garnishment. After crediting Armstrong $3000 in costs and attorney's fees, the district court awarded the remaining $25,464.26 to Gallegos. Armstrong now appeals from that judgment. Intervenors did not appeal.

## DISCUSSION

{6} We review a trial court's grant of summary judgment de novo, as a matter of law. *Self v. United Parcel Serv., Inc.*, 1998–NMSC–046, ¶ 6, 126 N.M. 396, 970 P.2d 582. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.*

### Gallegos' Writ of Garnishment is Subject to Contractual Defenses Armstrong had Against Eagle Eye

■ {7} "Garnishment proceedings provide a remedy, in the form of attachment, which is controlled by statute." *Amaya v. Santistevan*, 114 N.M. 140, 142, 835 P.2d 856, 858 (Ct.App.1992). Gallegos, as garnishor of Eagle Eye's rights to payment from Armstrong, has only those same rights that Eagle Eye could assert against Armstrong. *See Jemko, Inc. v. Liaghat*, 106 N.M. 50, 54, 738 P.2d 922, 926 (Ct.App.1987) (explaining that garnishor is subrogated to judgment debtor's rights against garnishee).

■ {8} The garnishee, Armstrong, has the same liability, legal and equitable, to the garnishor as it has to the judgment debtor, Eagle Eye. *See Field v. Sammis*, 12 N.M. 36, 47–48, 73 P. 617, 620 (1903) (holding that garnishor takes no more than rights of debtor); *see also Cent. Sec. & Alarm Co. v. Mehler*, 1998–NMCA–096, ¶ 13, 125 N.M. 438, 963 P.2d 515 ("[A] garnishor can acquire no greater rights by a writ of garnishment than those that the judgment debtor would have been able to assert against the garnishee."); *Jemko, Inc.*, 106 N.M. at 52, 738 P.2d at 924 ("A judgment creditor acting under a writ of garnishment, after due notice to interested parties, can only seize the property that belongs to the judgment debtor."); *Carpenters S. Cal. Admin. Corp. v. Mfrs. Nat'l Bank*, 910 F.2d 1339, 1341 (6th Cir.1990) (predicting that Michigan Supreme Court would hold that "the judgment-creditor garnishor stands in the same position as the judgment-debtor with respect to the garnishee and may not prevail against the garnishee unless the debtor could do so"); *Valley Nat'l Bank v. Hasper*, 6 Ariz.App. 376, 432 P.2d 924, 926 (1967) ("[A] garnishor cannot obtain

rights against a garnishee superior to the rights held by the judgment debtor against the garnishee at the time of garnishment."); *Messall v. Suburban Trust Co.*, 244 Md. 502, 224 A.2d 419, 421 (1966) ("[T]he rights of the creditor vis a vis the garnishee cannot rise above those of the debtor.").

{9} Thus, the garnishor stands in the shoes of the judgment debtor. Armstrong can assert against Gallegos any contractual defenses that it could have asserted under the Subcontract against Eagle Eye. *See Hasse Contracting Co. v. KBK Fin., Inc.,* 1999–NMSC–023, ¶¶ 19–22, 127 N.M. 316, 980 P.2d 641 (*Hasse II*) (allowing account debtor to assert contractual defenses against assignee); *see also Garland v. Sperling Bros.*, 6 N.M. 623, 632, 30 P. 925, 927 (1892) (holding that the debt must be "absolutely, and unconditionally owing and payable at the present or some future time" when the writ is served), *aff'd*, 7 N.M. 121, 32 P. 499 (1893); *Beaufort Transfer Co. v. Fischer Trucking Co.*, 357 F.Supp. 662, 667 (E.D.Mo.1973) ("The Missouri authorities make it abundantly clear, however, that a debt which is conditional or dependent for its existence upon some contingency is not a subject of garnishment.").

### The Subcontract

{10} We now turn to the Subcontract between Eagle Eye and Armstrong to assess Eagle Eye's rights against Armstrong, and therefore Gallegos' rights against Armstrong in light of Armstrong's defenses. We "apply the plain meaning of the contract language as written." *Christmas v. Cimarron Realty Co.*, 98 N.M. 330, 332, 648 P.2d 788, 790 (1982). Although the parties disagree as to the meaning of the Subcontract, neither claims it is ambiguous, and we do not find it so. *See Kirkpatrick v. Introspect Healthcare Corp.*, 114 N.M. 706, 711, 845 P.2d 800, 805 (1992) (holding that court decides as a matter of law whether contract is ambiguous; noting that parties' disagreement as to proper interpretation does not establish ambiguity).

{11} We also consider custom and usage in the construction industry to illuminate the meaning of the terms in the Subcontract. *See Points v. Wills*, 44 N.M. 31, 36–37, 97 P.2d 374, 377 (1939) (noting that evidence of industry custom is admissible to amplify but not to contradict express terms of contract); *see also* Restatement (Second) of Contracts § 222(3), at 155 (1981) ("Unless otherwise agreed, a usage of trade in the vocation or trade in which the parties are engaged or a usage of trade of which they know or have reason to know gives meaning to or supplements or qualifies their agreement."), § 220(1), at 147 ("An agreement is interpreted in accordance with a relevant usage if each party knew or had reason to know of the usage and neither party knew or had reason to know that the meaning attached by the other was inconsistent with the usage."); *cf. State ex rel. Nichols v. Safeco Ins. Co.*, 100 N.M. 440, 444, 671 P.2d 1151, 1155 (Ct. App.1983) (holding that evidence of usage of trade is admissible to illuminate terms of agreement for sale of goods).

{12} Both parties to the Subcontract, Armstrong and Eagle Eye, were members of the construction industry. We have commented earlier on a central custom in that industry: "Economic viability of the [construction] industry requires that payments made by the owner are properly applied down the line in order to assure performance and an unburdened final product." *Hasse Contracting Co. v. KBK Fin., Inc.*, 1998–NMCA–038, ¶¶ 27–34, 125 N.M. 17, 956 P.2d 816 (*Hasse I*), *aff'd on other grounds by Hasse II*, 1999–NMSC–023, 127 N.M. 316, 980 P.2d 641.

{13} Our deliberations are also informed by a statute pertaining to public works contracts that was in force at all times relevant to this dispute. In NMSA 1978, Section 13–4–28 (1995, repealed 2001), the legislature provided that contractors and subcontractors were required to pay their subcontractors and materialmen promptly out of monies received for payment on public works contracts:

Public works contracts *shall provide* that all payment for amounts due and owing shall be paid within twenty-one days after receipt of the request for payment by the central purchasing office to the contractor by mailing via first class mail or by hand delivery of the undisputed amount of any pay request based on work completed

or service provided under the contract.... The contract shall also provide that contractors and subcontractors make prompt payment to their subcontractors and suppliers for amounts due and owing within seven days after receipt of payment from the central purchasing office or the contractor or subcontractor. When the contractor receives payment from the central purchasing office for work completed, he is required to pay his subcontractors and suppliers promptly by mailing via first class mail or by hand delivery. If the contractor fails to pay his subcontractors and suppliers within seven days of receipt of payment from the central purchasing office, the contractor shall pay an interest penalty beginning on the eighth day after payment was due. Interest penalties shall be computed at one and one-half percent of the undisputed request for payment per month or fraction thereof until payment is issued. *These payment provisions apply to all tiers of contractors, subcontractors and suppliers.*

(Emphasis added.) The subsequent repeal of this provision does not deprive it of the legal force it had while it was in effect. Its provisions were mandatory and incorporated by law into the Subcontract. *See Schmick v. State Farm Mut. Auto. Ins. Co.*, 103 N.M. 216, 218, 704 P.2d 1092, 1094 (1985) (reading statutory provisions regarding uninsured motorists into automobile insurance policy).

{14} The Subcontract included certain paragraphs under the title "Additional Provisions," that allowed the Contractor, Armstrong, to take certain precautions to protect Eagle Eye's suppliers in the event that Eagle Eye's financial condition became unsound. Paragraphs 4 and 5 of the Additional Provisions read:

4. Upon request of Contractor, Subcontractor shall furnish to Contractor, from time to time, (1) sworn affidavits, in accordance with the form provided by Contractor, which shall state amounts due or to become due, for labor, materials, supplies, rentals on equipment and the like, used or to be used by Subcontractor on the job, amounts paid, and any other information clearly to indicate the financial condition of Subcontractor, insofar as the financial condition relates to performance under this subcontract, and (2) partial or final releases and waivers of lien from Subcontractor's materialmen, laborers or creditors. Regardless of the terms of payment provided for herein, Contractor, if it deems itself insecure, or deems that Subcontractor's financial condition has become unsound, shall have the right to take such steps as it may deem necessary to protect itself against claims including the right to control the application of funds otherwise payable to Subcontractor to satisfy obligations of Subcontractor for labor, materials, supplies, rentals on equipment, and the like, furnished or to be furnished by Subcontractor hereunder, and the right to direct Subcontractor to make immediate payment of unpaid bills to claimants upon written notice by Contractor.

5. Monies received by Subcontractor for the performance of this subcontract shall be used primarily for labor, material, rentals on equipment, and the like, used or to be used by Subcontractor on this job, and said monies shall not be diverted to satisfy other obligations of Subcontractor.

{15} As stated in Paragraph 4, the Additional Provisions provided that, regardless of other provisions for payment to Eagle Eye, Armstrong, "if it deems itself insecure, or deems that Subcontractor's financial condition has become unsound, shall have the right to take such steps as it may deem necessary to protect itself against claims including the right to control the application of funds otherwise payable to Subcontractor." Armstrong argues that it reasonably deemed itself insecure, and deemed that Eagle Eye's financial condition had become unsound, when it was served with the writ of garnishment showing a substantial unpaid judgment that Eagle Eye owed to Gallegos. Accordingly, Armstrong argues that it had a defense to any demand for direct payment to Eagle Eye, because under the Subcontract it had the right to control those funds. It follows, according to Armstrong, that it had the same defense to a garnishment by Gallegos, who must stand in the same shoes as Eagle Eye.

{16} In addition, Armstrong also points to Paragraph 5 of the Additional Provisions that provided that payments received by Eagle Eye would be used "primarily" to pay Eagle Eye's suppliers and "shall not be diverted to satisfy other obligations of Subcontractor [Eagle Eye]." Armstrong argues, self-evident as it may be, that any funds of Eagle Eye "diverted" to Gallegos would not be available, primarily or otherwise, to pay Eagle Eye's suppliers.

{17} Gallegos, although not a party to the Subcontract, does not agree with Armstrong's interpretation of its language. Gallegos contends that the last phrase in Paragraph 4, "upon written notice by Contractor," requires that Armstrong give written notice to Eagle Eye before exercising any of its rights to control funds under that paragraph. We disagree with Gallegos. The quoted language modifies the immediately antecedent clause and means only that Armstrong must give written notice before exercising "the right to direct Subcontractor to make immediate payment of unpaid bills to claimants." That language is not a prerequisite to Armstrong's exercise of the other rights under Paragraph 4. *See Hale v. Basin Motor Co.,* 110 N.M. 314, 318, 795 P.2d 1006, 1010 (1990) (" '[R]elative and qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to or including others more remote.' " (quoting *In re Goldsworthy's Estate,* 45 N.M. 406, 412, 115 P.2d 627, 631 (1941))).

{18} Gallegos also argues that the comma in Paragraph 4 before the words "and the right to direct Subcontractor to make immediate payment of unpaid bills to claimants upon written notice by Contractor" is not a disjunctive comma, separating that phrase with its requirement for written notice from the rest of the paragraph. Gallegos argues instead that the comma is merely one of a pair of commas setting off the phrase, "furnished or to be furnished by Subcontractor hereunder." We do not view the placement of a comma as controlling. Grammatically the phrase "upon written notice by Contractor" modifies only "the right to direct Subcontractor to make immediate payment of

unpaid bills to claimants," whether with or without the comma upon which Gallegos places such stress. It makes good sense that written notice to Eagle Eye would be required before Armstrong could require Eagle Eye to take action. However, no written notice to Eagle Eye would be necessary for Armstrong to invoke its own right to control the application of funds.

{19} We agree with Armstrong's interpretation of the Subcontract. We hold that the plain language of the Additional Provisions, Paragraphs 4 and 5, gave Armstrong the right to control the application of funds otherwise payable to Eagle Eye, and to pay Eagle Eye's Project creditors directly whenever it reasonably deemed itself insecure or Eagle Eye's financial condition unsound. Armstrong claims no rights in the money itself. We do not hold that it has any such rights, but only the right to direct payments of the money.

{20} The statute, Section 13–4–28, reinforces our conclusion that Eagle Eye's right to demand payment from Armstrong was not absolute. Armstrong's contractual rights to control payment reflected its statutory duty to see that all tiers of subcontractors and suppliers were paid, *see Hasse II,* 1999-NMSC–023, ¶¶ 19–21, 127 N.M. 316, 980 P.2d 641 (holding that Section 13–4–28 "provides an adequate basis" for Hasse to pay suppliers of its subcontractor rather than subcontractor's assignee). Armstrong's contractual right to control payments also reflects the expectations of the construction industry that suppliers and subcontractors down the "multi-tier" payment system will receive their proportionate share of payments made on the project. Therefore, Eagle Eye did not have an unconditional right to the entire $28,464.26, but only to such funds as remained after Armstrong exercised its contractual right to divert payment to Eagle Eye's suppliers and other creditors of the Project.

{21} We find support for our decision in cases from other jurisdictions. In *F & W Welding Service, Inc. v. ADL Contracting Corp.,* 217 Conn. 507, 587 A.2d 92, 98–99 (1991), the court held that a town's contractual right to withhold payment until the con-

tractor's work was acceptable was properly invoked as a defense to attachment of those funds by a creditor of the contractor. In *Town of Gastonia v. McEntee–Peterson Engineering Co.*, 131 N.C. 359, 42 S.E. 857, 858 (1902), the court held that the contractor's creditor could not garnish amounts due under a contract with the town when the contractor could not receive payment until it furnished the town with releases from its suppliers, and those releases were not forthcoming. *Cf. Victore Ins. Co. v. City of Bowie*, 23 S.W.3d 499, 503 (Tex.Ct.App.2000) (holding that when project owner had a contractual right to withhold from contractor amounts necessary to satisfy subcontractor and supplier claims, retained funds were not contractor's property, and federal government could not acquire those funds by a tax lien against contractor's property). *See generally* Christopher Vaeth, *Garnishment of Funds Payable Under Building and Construction Contract*, 16 A.L.R.5th 548 (1993).

{22} Gallegos cites various cases from other jurisdictions that we do not find persuasive. In *Able Distributing Co. v. Lampe*, 160 Ariz. 399, 773 P.2d 504, 510 (Ariz.t.App.1989), the Arizona court held that "[Debtor's] failure to demonstrate that all costs incurred in connection with the project had been paid does not make the debt contingent for purposes of garnishment." The court affirmed payment of remaining funds to the garnishor after deduction of lien amounts and back charges, noting that no further liens could be filed on the private construction project. *Id.* at 507, 510. We do not find the opinion in *Able Distributing* instructive because there was no indication that the garnishee had the contractual right to divert funds, as Armstrong did in this case, or that the garnishee could be held liable to unpaid suppliers. In *A.F. Blair Co. v. Mason*, 406 So.2d 6, 11–12 (La.Ct.App.1981), the court held that a progress payment to a contractor for a private construction project was due and owing at time writ of garnishment was served. The contractor's surety had to step in after service of the writ and finish the project. *Id.* The surety's subrogation to the contractor's right to receive payment was subsequent to the writ and was held not to defeat the rights of the garnishor. In *A.F. Blair*, like *Able*

*Distributing*, there was no indication that the garnishee had contractual rights similar to those of Armstrong to control distribution of the funds. Moreover, both of these cases involved private construction projects, whereas the project in this case is a public project to which the statutory policy applies protecting payments owed "to all tiers of contractors" of public works projects. Section 13–4–28.

{23} Gallegos also notes that Armstrong had taken no steps to assert any of its contract rights before the writ of garnishment was served, and thus Gallegos protests that his lien should take priority over Armstrong's rights. He relies on *Hasse II*, 1999–NMSC–023, ¶ 12, 127 N.M. 316, 980 P.2d 641 ("[T]iming and actual or constructive notice—not a general public policy favoring materialmen—are the principal considerations in determining priority between suppliers and other creditors, at least in the context of private construction projects."). *Hasse II*, however, proceeded to hold that the garnishee could assert contract defenses against the subcontractor's assignee. *Id.* ¶¶ 19–21. As we have explained, Armstrong possessed contract rights at the time the writ was served and was not required to take affirmative action under the contract to preserve them. This is not a case of establishing priorities among competing liens but of enforcing contractual rights. *See id.*

{24} Gallegos further relies on the principle that a writ of garnishment entitles the garnishor to take precedence over general creditors of the judgment debtor, a principle this court has endorsed in the past. *See Amaya*, 114 N.M. at 143, 835 P.2d at 859 (noting that a writ of garnishment has priority over writs served at a later time); *Behles v. Ellermeyer (In re Lucas)*, 107 B.R. 332, 335 (Bankr.D.N.M.1989) ("Once the lien attaches to the property, no contract creditor can obtain a superior judicial lien."). But Armstrong is not a general creditor. As we have explained, Gallegos is subrogated to Eagle Eye's contractual rights to the money. Because Armstrong has contractual defenses to paying Eagle Eye the entire $28,464.26, Gallegos is subject to those same contractual defenses. Our decision leaves the rights of

garnishors exactly where they have always been: superior to general creditors but subject to the contractual rights and duties of the judgment debtor. *Field,* 12 N.M. at 47–48, 73 P. at 620.

{25} Gallegos cites to *Central Security & Alarm Co. v. Mehler,* 1998–NMCA–096, ¶ 25, 125 N.M. 438, 963 P.2d 515, for the proposition that a non-bank garnishee cannot increase or decrease the assets of the debtor in its control after service of the writ. Gallegos reads *Central Security* too broadly. In that case we approved the rule that "[t]he garnishee's responsibility ends when it delivers a check to the judgment debtor." *Id.* ¶ 13. Here Armstrong, the garnishee, has not delivered a check to Eagle Eye. Eagle Eye has only a conditional right to the funds held by Armstrong, and Armstrong has chosen to assert its own contractual right to pay Eagle Eye's Project creditors directly out of the funds that it holds.

{26} Gallegos also argues that Armstrong may not assert the claims of Eagle Eye's suppliers, when the suppliers either failed to intervene below after receiving notice or intervened and failed to appeal to this Court. But Armstrong is asserting its own rights, not those of any other entity. Armstrong may assert its own contractual right to withhold payments destined for Eagle Eye's suppliers. Armstrong will have to pay those suppliers from other funds if Gallegos takes the entire amount due Eagle Eye.

{27} Finally, Gallegos asserts that Eagle Eye's suppliers need not be paid from the funds being garnished because the suppliers can make claims against the payment bond that Eagle Eye was required to post at the beginning of the Project to insure compliance with its payment obligations. *See* §§ 13–4–18 to –20 (New Mexico's Little Miller Act); *Hasse I,* 1998–NMCA–038, ¶ 11, 125 N.M. 17, 956 P.2d 816. The Supreme Court rejected this position in *Hasse II* and we reject it here. 1999–NMSC–023, ¶ 23, 127 N.M. 316, 980 P.2d 641 ("KBK insists that Gosney should not be paid from the interpled funds because, in its view, the payment bond required by the Little Miller Act adequately protects suppliers like Gosney. In other words, KBK would have the payment bond

be a supplier's exclusive remedy. There is no support in the [A]ct or at common law for this view, and we therefore reject it."). We also note this Court's prior observation in *Hasse I* on this same subject: "From a practical standpoint, acceptance of [Gallegos'] position would result in [Armstrong] creating a claim against itself since the project surety or the general contractor would seek reimbursement for payments made to [suppliers] under the payment bond." *Hasse I,* 1998–NMCA–038, ¶ 14, 125 N.M. 17, 956 P.2d 816.

## CONCLUSION

{28} We hold that the trial court erred in granting summary judgment to the garnishor, Gallegos. We remand for further proceedings so that the trial court may determine (1) the amounts to be diverted by Armstrong to Eagle Eye's suppliers, (2) how much should be retained by Armstrong to pay its attorneys, (3) how much ultimately belongs to Eagle Eye and is subject to garnishment, and (4) such other matters as are consistent with this opinion.

{29} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY, Judge, and CELIA FOY CASTILLO, Judge.